**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP., <br><br> Plaintiff, <br><br> v. <br><br> U.S. BANK, NATIONAL ASSOCIATION, <br> as Securities Intermediary, <br><br> Defendant. | C.A. No. _____ |

## COMPLAINT

Plaintiff, Ameritas Life Insurance Corp. ("Ameritas"), files and asserts this Complaint against Defendant, U.S. Bank, National Association ("U.S. Bank"), in its capacity as Securities Intermediary, and in support thereof, alleges and says:

## INTRODUCTION

1.      This action involves a stranger-originated life insurance ("STOLI") policy that was manufactured on the life of Irene Sloat, who, on information and belief, was induced to lend her life to investors who procured a $10 million wagering policy on her life (the "Policy") in violation of Delaware's Constitution, insurable interest laws, and public policy.

## PARTIES

2.      Ameritas is a life insurance company incorporated under the laws of State of Nebraska with its principal place of business in the State of Nebraska. Ameritas is therefore a citizen of the state of Nebraska for purposes of diversity jurisdiction.

3.       U.S. Bank is a national banking association organized and existing under federal law with its main office located at 800 Nicollet Mall, Minneapolis, MN 55402. U.S. Bank is therefore a citizen of the State of Minnesota for purposes of diversity jurisdiction. U.S. Bank is

named as a party to this action because, as set forth below, in its capacity as Securities Intermediary, it claims to be the owner and beneficiary of the Policy.

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiff, a citizen of Nebraska, and the Defendant, a citizen of Minnesota.

5.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Delaware.

## FACTS COMMON TO ALL CLAIMS

6.     This action concerns a life insurance policy that is controlled by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute, 18 Del. C. § 2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." *Id.* at § 2704(e)(4). The Delaware insurable interest statute further provides that a trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." *Id*. at § 2704(e)(4), (g). Notably, here, upon information and belief, the Policy was issued for delivery to The Irene Sloat Life Insurance Trust, which is a Delaware trust, in Delaware, and was signed for by, upon information and belief, the trustee, Wilmington Trust Company ("Wilmington Trust"), which has its principal place of business in Delaware.

7.     As stated by the Supreme Court of Delaware, it is well recognized that "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*,

28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured as a wager on the life of the person insured not only violate Delaware's constitutional prohibition on wagering, but they also violate the state's insurable interest requirement and public policy, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id.*

8.      Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

9.      It is well established, however, that when this was happening in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

10.     One such STOLI promoter was a family of interrelated Delaware entities known generally as Coventry, which operated an extremely large Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained below, Coventry operated a "back-end" STOLI scheme using non-recourse premium finance program.

11.     Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

12.     The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

13.     The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the policies at issue were procured and paid for by third parties without an insurable interest in the insureds.

14.     In short, STOLI policies violate insurable interest and anti-wagering laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of the insureds—into cash machines whereby strangers to the insureds are more interested in seeing the insureds dead than alive.

A.      **Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

15.     It is widely recognized that one of the most common STOLI schemes involved the use of two-year, non-recourse premium financing. Under this type of STOLI scheme, a trust is typically created in the insured's name to serve as the nominal owner of the policy and to enter into a two-year loan where the only collateral is the policy itself, which is assigned as such to the

STOLI lender. The loan is designed to coincide with the policy's two-year contestable period, and the policy is relinquished or sold to an investor after that period has expired.

16.     The Delaware Supreme Court in *Price Dawe* recognized that policies created using this same type of two-year non-recourse premium finance scheme—which is what Coventry orchestrated here—are STOLI and thus void *ab initio*. 28 A.3d at 1070-71, n.27 (citing Martin, *Betting on the Lives of Strangers*, 134 U. Pa. J. Bus. L. at 175 (STOLI exists where a trust is used to own the policy and the interests in the trust are transferred to an investor at the end of a two-year loan)); *id.* at n.32 (citing *Spin-Life Insurance Policies: A Dizzying Effect on Human Dignity and the Death of Life Insuranc*e, 7 Ave Maria L. Rev. 605, 606, 622-24 (2009) (STOLI includes two-year loans where "the loan amount, interest, and fees imposed by the investors are high enough that the applicant is forced to accept the offers made by the investors and transfer ownership of the policy")).

17.     Since at least 1914, Delaware law has followed the United States Supreme Court's decision in *Warnock v. Davis*, 104 U.S. 775 (1881). *See Balt. Life Ins. Co. v. Floyd*, 91 A. 653, 656 (Del. 1914) ("Where a third party, without any insurable interest in the life of another, procures a policy of insurance on the life of such person, either by having a policy issued directly to himself, or by having the person whose life is insured take out a policy to himself, and then assign it, these facts, as is held in *Warnock v. Davis* [104 U.S. 775, 26 L. Ed. 924], conclusively show that the transaction is a mere speculation on the life of another, and as such is contrary to public policy, and therefore void.").

18.     Although dating back to 1881, *Warnock* involved a stranger-originated, premium-financed life insurance policy where an insured was induced to apply for a policy that was paid for by an entity known as the Scioto Trust Association. In exchange, the trust promised that when the

5

insured died, one tenth of the policy's death benefit would be paid to his wife. After the insured

passed, the Court held that the policy was a mere wager on the life of the insured.

19.     Not surprisingly, therefore, every court that has considered Coventry's two-year,

non-recourse premium finance scheme under Delaware law has held, as a matter of law, that: (i)

Coventry operated a STOLI program; (ii) policies produced by that program are void *ab initio*;

and (iii) where, as here, an insurer challenges the policy for lack of insurable interest, no death

benefit need be paid. *See, e.g., Sun Life v. U.S. Bank*, No. 14-CIV-62610, 2016 WL 161598, at

*10-13 (S.D. Fla. Jan. 14, 2016), *aff'd*, 693 F. App'x 838 (11th Cir. June 12, 2017) ("*Malkin*");

*U.S. Bank v. Sun Life*, No. 14-4703, 2016 WL 8116141, at *12-14 (E.D.N.Y. Aug. 30, 2016) ("*Van

de Wetering*"), *adopted in full*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017); *Sun Life v. U.S. Bank*,

369 F. Supp. 3d 601, 609 (D. Del. 2019) ("*Sol*"); *Estate of Malkin v. Wells Fargo*, 379 F. Supp.

3d 1263 (S.D. Fla. 2019), *aff'd in relevant part*, 998 F.3d 1186 (11th Cir. 2021) ("*Estate of

Malkin*").

20.     The New Jersey Supreme Court also recently followed Delaware's lead, holding

that STOLI policies violate insurable interest laws, and specifically holding that two-year, non-

recourse STOLI schemes are a common way in which STOLI policies were created. *See Sun Life

v. Wells Fargo*, 208 A.3d 839, 848 (N.J. 2019) ("Generally, an investor funds a STOLI policy from

the outset, which makes it possible to obtain a policy with a high face value. The investor may

lend the insured 'the money to pay the premiums for' the period of incontestability, typically two

years. It is also common for an insured to buy the policy in the name of a trust and name a 'spouse

or other loved one as the trust beneficiary.' In such arrangements, [i]f the insured dies within [the

contestability] period, his spouse, as beneficiary of the insurance trust, will get the death benefit

(the free insurance), pay back the loan plus interest from the proceeds, and often pay the broker up

to fifty percent of the benefit received. If the insured lives beyond two years or the contestability period, then the life settlement company buys the beneficial interest in the insurance trust, paying the insured a lump sum percent of the face value of the policy . . . . The life settlement company or its investors will continue to pay the premiums on the policy, and when the insured dies, they will get the death benefit. Clearly, the sooner the insured dies, the greater the company's profit. STOLI arrangements thus present a significant legal problem: the investors have 'no insurable interest in the life of the insured.' As a result, the transactions pose questions in light of New Jersey's policy against wagering.") (citing Martin, *Betting on the Lives of Strangers*, 13 U. Pa. J. Bus. L. at 188).

21.     And as to Coventry specifically, beginning in 2001, Coventry became party to a series of requirements contracts through which Coventry was engaged to "originate" Delaware life insurance policies that, from the start, were intended to be transferred to other investors.

22.     To manufacture such life insurance policies, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would create and procure on each insured's life.

23.     Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carrier, thus further adding to Coventry's financial incentive to originate new life insurance policies.

24.     Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or service any life insurance policies on the insured's life, which included, but were

not limited to, the power to complete and execute any applications or other documents in connection with the maintenance or liquidation of the policies.

25.     Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. In many cases, if not all, these life expectancy reports were obtained from American Viatical Services, LLC ("AVS"), which was a Coventry "Approved Underwriter."

26.     Coventry would then use the information provided by AVS to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. The purpose of this underwriting was to, among other things, project how long any potential insured might live, and thus how valuable a particular policy might be.

27.     Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for. Coventry, with the assistance of local insurance brokers, would start the application process by having these local insurance brokers submit incomplete applications to insurance carriers chosen by Coventry.

28.     Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, and assuming Coventry was still interested in obtaining a policy on that person's life, Coventry would then create and fund a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential policy on the insured's life. Coventry would create and fund this Delaware statutory trust by directing the local insurance broker to have the insured execute a number of non-negotiable Coventry trust documents with a trust nominally funded with $1.00. The trust would have no other assets and it would be established by and for Coventry, and was expressly not intended to serve any valid estate planning need for the insured.

29.     Coventry would also have the insured execute a separate trust agreement whereby Coventry would create and fund (again with $1.00) a second Delaware statutory trust, called a sub-trust. Under the terms of this sub-trust agreement, all assets of the initial trust were immediately transferred and assigned to the sub-trust, including any and all future rights or interests in any life insurance policy procured by Coventry, through the initial trust, on the insured's life.

30.     With regard to both Delaware statutory trusts, Coventry would choose the trustee, which in most, if not all, cases was Wilmington Trust, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

31.     Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware statutory trust in the insured's name as both the owner and beneficiary of the policy being applied for; indicate that the trust had been formed in Delaware; and state that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

32.     The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts under which it was engaged to "originate" life insurance policies for resale to other investors.

33.     The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware statutory trust owner. The Delaware corporate trustee would then executed a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

34.     Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

35.     But the so-called "loan" to the sub-trust was a sham. It was structured with a 26-month term with no genuine obligation for anyone to repay and no recourse to the insured. The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the 26-month term, all rights and interests in both the Delaware statutory trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" which, on information and belief, is exactly what occurred in the majority of Coventry's transactions. Regardless of whether Coventry acted through a relinquishment or otherwise, it would then typically install itself as the new record holder of the interests in the Delaware statutory trust that owned the policy and the sub-trust, and Coventry would then in effect own the policy.

36.     Coventry would then move forward with the pre-ordained plan of selling and conveying the Delaware trust-owned policy to its requirements contract counter-party, which was an AIG subsidiary by the name of Lavastone Capital LLC ("Lavastone"), which would either hold the policy until maturity or resell it to another investor.

37.     Coventry was then engaged by Lavastone to "service" the policy until the insured died, which required that Coventry would pay ongoing policy premiums on behalf of the policy's actual owner and Coventry would contact the insured or her family at least once every three months to confirm whether the insured had died yet. Once Coventry learned an insured had died, it would obtain a death certificate and prepare the necessary forms to make a claim for the policy's death benefit.

38.     And as to Coventry specifically, it has been determined that Coventry did not act in "good faith" when it procured policies using its two-year, non-recourse premium finance program. *See Sol*, 369 F. Supp. 3d at 614 ("On the record before the Court, taking the evidence in the light most favorable to Defendant, a reasonable factfinder could only find that the third parties – Coventry, LaSalle, and/or SFG – did not act in good faith.").

**B.      The Application and Issuance of a $10 Million Life Insurance Policy**

39.     In March 2005, Union Central Life Insurance Company ("Union Central") received a preliminary inquiry regarding a life insurance policy on the life of Irene Sloat ("Ms. Sloat" or the "Insured"), a Florida resident.

40.     In September 2005, Union Central received a completed "Application for Insurance," (the "Application") seeking a $10 million face amount universal life insurance policy on the life of the Insured, who was then 79 years old. The Application elected Death Benefit Option "C" with a death benefit including the specified face amount and a return of premium. A true and

correct copy of the Application, with appropriate redactions of personal identifying information, is attached as Exhibit A.

41.     The Application represented that the Insured had gross annual unearned income (dividends, interest, net real estate income, etc.) of "$300-400," and a net worth of $10 million. *Id.* at 4. The Application identified the purpose of the sought-after policy to be "Estate – Other" with an additional representation that the sought-after policy was for "liquidity for tax." *Id.* at 9.

42.     The Application identified the owner and beneficiary of the proposed policy as "The Irene Sloat Life Insurance Trust," a Delaware trust (the "Trust"). *Id.* at 2.

43.     The Application identified the Trust as a Delaware trust, formed under Delaware law on August 31, 2005, and acting at the direction of a Delaware trustee, Wilmington Trust, located at 1100 North Market Street, Wilmington, DE 19890. *Id.* at 2.

44.     The Application represented that the Insured signed the Application in Jacksonville, Florida, on September 2, 2005. *Id.* at 8.

45.     The Application was also signed on September 2, 2005, in Wilmington, Delaware, by Mr. Scott A. Huff, financial services officer for Wilmington Trust, as trustee of the Trust and owner and beneficiary of the purported policy. *Id.* The Application was also signed by the producer of the policy, David Kossak. *Id.*

46.     The Application also contained declarations that the statements and answers in the Application were complete and true to the best of the signatories' knowledge and belief and that the answers therein were correctly recorded. *Id.*

47.     Thus, in completing the Application, the signatories knew that they were required to provide truthful, accurate, and honest responses to the questions presented. Furthermore, they knew that Union Central would rely upon the statements recorded on the Application in

determining whether to issue a policy with the face amount requested, or whether to issue a policy at all.

48.     In reliance upon the representations contained in the Application, and other documents and information submitted to Union Central in connection with the Application, Union Central issued a policy with a death benefit equal to $10 million plus the premiums paid (less any outstanding loans or surrenders) (policy number U000031508) (the "Policy"), with an effective date of September 22, 2005.

49.     On or about September 16, 2005, Union Central received a "Policy Delivery Receipt" executed by the producer, Mr. Kossak, and Mr. Scott A. Huff, financial services officer for the trustee, Wilmington Trust. Upon information and belief, Mr. Huff was an employee in Wilmington Trust's Wilmington, Delaware office and thus, signed the delivery receipt and accepted delivery of the Policy in Wilmington, Delaware.

50.     On or about September 19, 2005, Union Central received a wire transfer in the amount of $927,384.15 from a LaSalle Bank, N.A., bank account for the initial premium under the Policy.

51.     Upon information and belief, and unbeknownst to Union Central at the time, the funds for this premium payment were either provided to the Insured by a third party with no insurable interest in the Insured's life, or were paid by the Insured with the understanding that she would soon afterwards be reimbursed. At no point was the Insured at risk that her own funds would be used to pay premiums on the Policy.

52.     In fact, upon information and belief, and unknown to Union Central at the time, the Policy premiums were paid via a purported Coventry non-recourse premium finance loan.

53.     Upon information and belief, as part of this purported "loan," the "lender" would reimburse the amount of the initial premium payment, either to the Insured or to the third-party that provided the initial funding.

54.     Upon information and belief, as a result of this purported "loan," neither Ms. Sloat nor anyone with an insurable interest in her life ever provided the funding for any premiums paid on the Policy. The existence of this "loan," however, was not disclosed to Union Central.

55.     Upon information and belief, the purpose of this "loan," and indeed the very purpose of the Policy, was not to provide estate protection or to serve any valid and good faith insurance purpose, but rather to allow strangers with no insurable interest in Ms. Sloat's life to wager on her early demise.

56.     On or about November 5, 2007, Union Central received and processed a request to transfer the ownership and beneficiary of the Policy from the Trust to U.S. Bank, N.A., as securities intermediary.

57.     On July 1, 2014, Union Central merged into Ameritas, and as a result, with respect to the Policy, Ameritas is the successor in interest to Union Central.

58.     On March 27, 2022, Ms. Sloat passed away.

59.     On April 1, 2022, Ameritas received a claim for the Policy's death benefit by or on behalf of U.S. Bank.

**C.     The Policy was Procured as Part of an Illegal Wagering Scheme to Gamble on the Life of Ms. Sloat**

60.     Following receipt of notice of Ms. Sloat's death, Ameritas commenced a review of the purported Policy and has determined, upon information and belief, that it was at all times material hereto meant as an illegal wager on the life of Ms. Sloat. Ameritas has further determined, on information and belief, that the Policy lacked an insurable interest prior to and at its inception

14

and it was procured as an illegal wager on the life of the insured as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional, statutory, and common law prohibitions on wagering. Ameritas has further determined that any appearance of insurable interest was superficial only and was in reality a complete and total sham designed to conceal the true wagering nature of the purported Policy.

61.     Moreover, upon information and belief, the source of the funds for the initial premium payment on the Policy was not Ms. Sloat or any person or valid entity possessing an insurable interest in her life. Instead, the source of the premium was Coventry and/or other persons or entities who lacked an insurable interest in Ms. Sloat's life and were participating in a wager on her life.

62.     Upon information and belief, Coventry procured the Policy through an illegal STOLI scheme, and Coventry lacked a valid insurable interest in the life of Ms. Sloat.

63.     To induce Ms. Sloat to allow the Policy to be procured on her life, Coventry and those acting on its behalf may have represented that the Policy was being procured through a legitimate and legal transaction, or further induced Ms. Sloat with the promise of financial compensation if she permitted the Policy to be procured.

64.     Upon information and belief, Coventry acted through its agent(s) to have an application for the Policy submitted to the insurance company that ultimately issued the Policy.

65.     To facilitate these transactions, Coventry created The Irene Sloat Life Insurance Trust dated August 31, 2005, as a Delaware trust, installed Wilmington Trust as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

66.     The Trust was a sham and used as a cover, because on information and belief it was nominally funded and created as a means to conceal the fact that it was being used to feign

technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Trust lacked any valid insurable interest in the Insured's life.

67.    Upon information and belief, Coventry further created a sub-trust (the "Sub-Trust") to the Trust. The Sub-Trust was also established as a mere cover to procure the Policy without a valid insurable interest.

68.    Upon information and belief, the Policy insuring the life of Ms. Sloat was issued and delivered in Delaware to the Trust, as described above.

69.    Upon information and belief, in connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

70.    This purported "loan" was secured solely by a security interest in the Trust and Sub-Trust that held the Policy.

71.    As a result of this purported "loan," neither Ms. Sloat nor anyone with an insurable interest in her life ever paid any premiums on the Policy. Rather, the loan was used to conceal the fact that such premiums were paid by Coventry for the purpose of creating a wager on Ms. Sloat's life.

72.    Moreover, the purpose of the Policy was not to provide estate protection for Ms. Sloat, but rather she was used as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on her early demise.

73.    Upon information and belief, in connection with the purported "loan" becoming due 26 months after issuance in September 2005, stranger investors unrelated to Ms. Sloat took formal control of the Policy in November 2007.

74.     On or about November 5, 2007, Union Central received and processed a request to transfer the ownership and beneficiary of the Policy from the Trust to U.S. Bank, N.A., as securities intermediary.

75.     Upon information and belief, U.S. Bank acted as securities intermediary and/or as agent in connection with the Policy for Coventry and later for a stranger investor(s) with no insurable interest in Ms. Sloat's life.

76.     None of this was disclosed to Ameritas. Instead, upon information and belief, those seeking to procure the Policy, by design, disguised the true wagering nature of the Policy by, *inter alia*:

- Falsely representing that the Insured had established the Trust in Delaware for a legitimate purpose and that the Policy's purpose was for "Estate - Other" and for "liquidity for tax." Instead, the Trust was established solely for the purpose of serving as a vehicle through which third-party investors would make an illegal wager on the life of the Insured in violation of applicable Delaware law; and

- Taking steps to disguise the true origin of the premium payments which, upon information and belief, were funded by third-party persons or entities other than (and unrelated to) the Insured, and at no point did the Insured ever intend to use any of her own money fund premiums.

77.     In addition to the above, Coventry and other third-party stranger entities who acted in concert with each other to procure and generate the Policy also took steps after issuance of the Policy so as to further and continually conceal the true wagering nature of the transaction. Upon information and belief, and among other things, this included:

- Maintaining the illusion that the Trust was established by Ms. Sloat as a valid estate planning mechanism and that the Policy was being held by the Trust for those purposes, when in fact the Trust was created solely as a mechanism to allow Coventry and its associates to obtain ownership of the Policy.

- Maintaining the illusion, including in subsequent communications and applications to Ameritas, that the Policy had been procured for valid estate planning purposes.

17

78.    Upon information and belief, as part of the illegal wagering scheme, Coventry and the other individuals and/or entities acting in concert with each other to generate the Policy misrepresented and otherwise concealed from that, from the outset, the Policy was never intended to benefit anyone with an insurable interest in the Insured's life, but was instead an instrument allowing stranger investors to gamble on her life.

79.    Since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law. *Estate of Malkin*, 379 F. Supp. 3d at 1272-73 (declaring Coventry policy void *ab initio* under Delaware law), *aff'd on appeal that policy was void*, 998 F.3d at 1196-97; *Sol*, 369 F. Supp. 3d at 609-10 (same); *Van de Wetering*, 2016 WL 8116141, at *15 (same), *r. & r. adopted*, 2017 WL 347449; *Malkin*, 2016 WL 161598, at *14 (same), *aff'd on all issues except pre-judgment interest*, 693 F. App'x 838.

80.    Thus, since at least 2016—before Ms. Sloat passed away and U.S. Bank sought the Policy's death benefit here—U.S. Bank knew or should have known that the Policy lacked insurable interest. Yet, U.S. Bank continued to pay premiums and sought the Policy's death benefit anyway.

81.    On November 16, 2021, the Delaware Supreme Court issued a unanimous, *en banc* decision in *Lavastone Capital LLC v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Berland*"), which involved certified questions of law arising out a Coventry-procured life insurance policy. In *Berland*, the Delaware Supreme Court held clearly that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes in force." *Id*. at *4.

82.     In so holding, the Delaware Supreme Court in *Berland* reaffirmed its prior unanimous, *en banc* decision in *Price Dawe* which held, *inter alia*, that Delaware has an immense public policy interest in preventing STOLI transactions from coming to fruition. Indeed, as *Price Dawe* held, STOLI policies violate Delaware's Constitution and are, therefore, void *ab initio* and a "fraud on the court" and can never be enforced, and thus assignments of STOLI policies are also void *ab initio* and ineffective as a matter of law. 28 A.3d at 1068 n.25, 1071.

83.     Ameritas has determined, on information and belief, that the Policy was at all times material hereto meant as an illegal wager on the life of Ms. Sloat and it was procured as an illegal wager on the life of the Insured as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional statutory, and common law prohibitions on wagering.

84.     Ameritas has further determined, on information and belief, that the Policy lacked an insurable interest prior to and at its inception, and that any appearance of insurable interest was superficial only and was in reality a complete and total sham designed to conceal the true wagering nature of the Policy.

85.     Ameritas has further determined, on information and belief, that the Trust itself was an illegal sham created to give the false appearance of a valid insurance trust for valid estate planning purposes, and thus give the superficial—but entirely false—appearance of a legitimate insurable interest.

86.     Moreover, upon information and belief, the source of the funds for the initial premium payment on the Policy was not the Insured or any person or valid entity possessing an insurable interest in her life. Instead, the source of the premium was Coventry and/or other associated third-party investors, persons, or entities who lacked an insurable interest in the Insured's life and were participating in a wager on her life

87.     Upon information and belief, the instant Policy was procured pursuant to this Coventry scheme.

88.     Thus, on information and belief, as part of the illegal wagering scheme, the stranger entities acting together to generate the Policy misrepresented and otherwise concealed from Ameritas, at the outset, that Policy was intended to be transferred to a different owner with no insurable interest in the life of Ms. Sloat.

**<u>FIRST CAUSE OF ACTION</u>**

**<u>DECLARATORY JUDGMENT – ILLEGAL HUMAN LIFE WAGERING CONTRACT</u>**

89.     Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

90.     The Policy was applied for and signed in Delaware by a Delaware statutory trust, as owner and beneficiary of the Policy. The Policy was then actually delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware. The Policy is governed by Delaware law. 18 Del. C. § 2704(e)(4), (g).

91.     The Delaware Constitution provides that "[a]ll forms of gambling are prohibited in this State except [those explicitly set forth in the statute]." Del. Const. Art. II, § 17. Moreover, the Delaware Supreme Court in *Price Dawe* and more recently in *Berland* addressed the issues associated with life insurance policies used to wager on the death of insureds and has held that, under Delaware law, such policies are mere wagering contracts and are void *ab initio*.

92.     As set forth herein, the Policy was, from the outset, procured by Coventry and its agents and other third parties and intended as a wager on the life of Ms. Sloat. Whether Ms. Sloat knew the details of this scheme or her identity was merely used as an instrumentality to procure the Policy, stranger investors were wagering on Ms. Sloat's life and hoping to trigger a secondary market cash-in on the Policy's death benefit.

93.     Accordingly, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated the Delaware's Constitution, statutes, common law, and public policy, thus rendering the Policy void *ab initio*, meaning that the Policy never came into existence.

**SECOND CAUSE OF ACTION**

**DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST**

94.     Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

95.     The Policy was intentionally structured to be a "trust-owned insurance policy" as defined by Delaware's insurable interest statute, 18 Del. C. § 2704(e)(4). Because the Policy was delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware, the existence of an insurable interest "shall be governed by [Delaware's insurable interest statute] without regard to [the] insured's state of residency or location." 18 Del. C. § 2704(g)

96.     Under Delaware law, only a valid and legitimate insurance trust can have a valid insurable interest in the life of the insured. *See* 18 Del. C. § 2704(c)(5).

97.     However, here, because the Trust was an illegitimate cover for the wager on Ms. Sloat's life, the Trust lacked any insurable interest in the life of Ms. Sloat. Accordingly, no insurable interest existed at the time of issuance of the Policy, and the Policy is void *ab initio* for lack of insurable interest.

98.     Additionally, the Policy was applied for and issued at the behest of individuals or entities—with no insurable interest in the life of the insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Accordingly, the Policy is void *ab initio* for lack of an insurable interest.

99.     Therefore, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy lacked insurable interest because it was procured by and for the benefit of strangers without an insurable interest under Delaware law.

WHEREFORE, Ameritas respectfully requests the entry of an Order by this Court as follows:

A.     Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Ms. Sloat;

B.     Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

C.     Declaring that because the Policy is void *ab initio* it never existed;

D.     Declaring that because the Policy is void *ab initio* the Court will leave the parties to this illegal contract as it finds them, thus permitting Ameritas to retain some or all of the premiums paid on the Policy;

E.     Awarding Ameritas attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

F.     Awarding Ameritas any further relief this Court deems appropriate.

*[signature block on next page]*

**COZEN O'CONNOR P.C**

*/s/ Kaan Ekiner*
Kaan Ekiner (No. 5607)
1201 North Market St., Ste. 1001
Wilmington, DE 19801
Phone: 302-295-2046
Fax: 302-250-4356
kekiner@cozen.com

Michael J. Miller (*pro hac vice to be filed*)
Gregory J. Star (*pro hac vice to be filed*)
Philip J. Farinella (*pro hac vice to be filed*)
Duncan R. Becker (*pro hac vice to be filed*)
1650 Market St., Ste. 2800
Philadelphia, PA 19103

*Attorneys for Plaintiff,*
*Ameritas Life Insurance Corp.*

DATED: May 10, 2022