**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP., <br><br> Plaintiff, <br><br> v. <br><br> U.S. BANK, NATIONAL ASSOCIATION, as Securities Intermediary, <br><br> Defendant. | Civil Action No. 1:22-cv-00623-JLH |

## FIRST AMENDED COMPLAINT

Plaintiff, Ameritas Life Insurance Corp. ("Ameritas"), files and asserts this First Amended Complaint against Defendant, U.S. Bank, National Association ("U.S. Bank"), in its capacity as Securities Intermediary, and in support thereof, alleges and says:

## INTRODUCTION

1.       This action involves a stranger-originated life insurance ("STOLI") policy that was manufactured on the life of Irene Sloat, who, on information and belief, was induced to lend her life to investors who procured a $10 million wagering policy on her life (the "Policy") in violation of Delaware's Constitution, insurable interest laws, and public policy.

## PARTIES

2.       Ameritas is a life insurance company incorporated under the laws of State of Nebraska with its principal place of business in the State of Nebraska. Ameritas is therefore a citizen of the state of Nebraska for purposes of diversity jurisdiction.

3.        U.S. Bank is a national banking association organized and existing under federal law with its main office located at 800 Nicollet Mall, Minneapolis, MN 55402. U.S. Bank is therefore a citizen of the State of Minnesota for purposes of diversity jurisdiction. U.S. Bank is

named as a party to this action because, as set forth below, in its capacity as Securities Intermediary, it claims to be the owner and beneficiary of the Policy.

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiff, a citizen of Nebraska, and the Defendant, a citizen of Minnesota.

5.     This Court has personal jurisdiction over U.S. Bank because Ameritas's First Amended Complaint arises out of U.S. Bank's transaction of business in Delaware and its contracts to supply services in Delaware.  *See* 10 Del. C. § 3104(c)(1), (2).  U.S. Bank purposefully availed itself of the rights and privileges of doing business in Delaware.

6.     In 2001, U.S. Bank entered into a long-standing contractual relationship, centered in Delaware, with Coventry First, LLC (a member of a family of Delaware entities known generally as "Coventry") and an American International Group, Inc. ("AIG") entity which was the predecessor of two AIG-owned, Delaware limited liability companies known as AIG Life Settlements, LLC and Lavastone Capital, LLC.

7.     The venture's purpose was to use Delaware entities—created pursuant to Delaware statute and registered with the Delaware Department of State—to originate, aggregate, and securitize multi-million dollar life insurance policies on the lives of senior citizens.

8.     In connection with this arrangement, Coventry solicited insureds across the nation to create hundreds (and perhaps thousands) of Delaware life insurance policies for the expected and intended purchase by U.S. Bank, as securities intermediary for AIG. Coventry did this by creating under the Delaware Code hundreds (and perhaps thousands) of Delaware statutory trusts (including The Irene Sloat Life Insurance Trust) to apply for and accept delivery of those policies (including the Sloat Policy) in Delaware. To invoke the privilege of carrying out business in

Delaware and thereby to enjoy the benefits and protections of Delaware law, hundreds (and perhaps thousands) of certificates of trust were filed with the Delaware Secretary of State, including the one pertinent to the Irene Sloat Life Insurance Trust and the Sloat Policy.

9.     In connection with this arrangement, Delaware was purposefully selected to create these Delaware statutory trusts to apply for and own these Delaware policies based on the benefits and advantages U.S. Bank and others saw in Delaware law. These acts were an integral component of the total transaction from which Ameritas's claims arise.

10.     Shortly after the individual policies' two-year contestability provisions, Coventry caused these policies to be conveyed from the individual Delaware statutory trusts that originally applied for and owned them to a single Delaware statutory trust known as the AIG Life Settlements Titling Trust (or "Delaware Titling Trust"). The Delaware Titling Trust was created in Delaware in 2001 by Coventry, U.S. Bank, and others.

11.     U.S. Bank and some or all of its contractual partners chose to create the Delaware Titling Trust under the Delaware Code for the express purpose of receiving, aggregating, and holding in one place for investment purposes the hundreds (and perhaps thousands) of Delaware policies originated by Coventry.

12.     Since its creation in Delaware in 2001, U.S. Bank has served as both trustee and securities intermediary for the Delaware Titling Trust, and U.S. Bank's subsidiary, U.S. Bank Trust, N.A., has served as the contractually denominated "Delaware Co-Trustee" of the Delaware Titling Trust.

13.     To invoke the privilege of carrying out this business in Delaware and thereby to enjoy the benefits and protections of Delaware law, numerous filings were made with the Delaware Secretary of State. U.S. Bank and the other entities that created the Delaware Titling Trust chose

Delaware based on the benefits and advantages they saw in Delaware law. U.S. Bank's creation of the Delaware Titling Trust to aggregate life insurance policies (including, upon information and belief, the Sloat Policy) and U.S. Bank's service as trustee and securities intermediary to the Delaware Titling Trust from 2001 (including, upon information and belief in connection with the Sloat Policy) were integral components of the total transaction from which Ameritas's claims arise.

14.     It is neither unfair nor unexpected for U.S. Bank to be haled into court in Delaware in connection with the Sloat Policy. As an initial matter, the contractual framework into which U.S. Bank entered specifically contemplated U.S. Bank being sued on account of the policies being originated and placed into the Delaware Titling Trust for which U.S. Bank served as trustee and securities intermediary.

15.     Similarly, U.S. Bank knew from the outset that it and its contractual partners would extensively avail themselves of the privilege of doing business in Delaware. Indeed, at least by the time the Sloat Policy was issued—and likely since the inception of the arrangement—U.S. Bank would have known that: (a) the life insurance policies being originated would be applied for, delivered to, and initially owned by individual Delaware statutory trusts (including The Irene Sloat Life Insurance Trust) operating in Delaware through Delaware trustees; (b) these policies therefore constitute "trust-owned life insurance policies" as defined by 18 Del. C. § 2704(e)(4); and (c) these policies (including the Sloat Policy) would be transferred by U.S. Bank into another Delaware statutory trust (i.e., the Delaware Titling Trust) created by U.S. Bank and others in Delaware and pursuant to Delaware law, with U.S. Bank at all times serving as trustee and securities intermediary and U.S. Bank Trust, N.A., serving as "Delaware Co-Trustee."  Through this process—and including, upon information and belief, the Irene Sloat Life Insurance Trust and Sloat Policy— hundreds (and perhaps thousands) of Delaware statutory trusts were created; hundreds (and

perhaps thousands) of Delaware trust-owned life insurance policies were procured, delivered, accepted, and held in Delaware; and hundreds (and perhaps thousands) of such Delaware trust-owned policies were then transferred to the Delaware Titling Trust to be held and maintained in Delaware by U.S. Bank.

16.     The Court also has in rem jurisdiction over the Sloat Policy because Ameritas's core claim is that the Sloat Policy is void *ab initio*. The Sloat Policy was initially held and owned by the Trust, a Coventry-created Delaware statutory trust that was physically located in Delaware and which at all times operated through a Delaware corporate trustee located in Delaware.

17.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Delaware.

<u>**FACTS COMMON TO ALL CLAIMS**</u>

18.     This action concerns a life insurance policy that is controlled by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute, 18 Del. C. § 2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." *Id.* at § 2704(e)(4). The Delaware insurable interest statute further provides that a trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." *Id*. at § 2704(e)(4), (g). Notably, here, upon information and belief, the Policy was issued for delivery to The Irene Sloat Life Insurance Trust, which is a Delaware trust, in Delaware, and was signed for by, upon information and belief, the trustee, Wilmington Trust Company ("Wilmington Trust"), which has its principal place of business in Delaware.

19.     As stated by the Supreme Court of Delaware, it is well recognized that "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured as a wager on the life of the person insured not only violate Delaware's constitutional prohibition on wagering, but they also violate the state's insurable interest requirement and public policy, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id.*

20.     Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

21.     It is well established, however, that when this was happening in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

22.     One such STOLI promoter was a family of interrelated Delaware entities known generally as Coventry, which operated an extremely large Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United

States. As explained below, Coventry operated a "back-end" STOLI scheme using non-recourse premium finance program.

23.     Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

24.     The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

25.     The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the policies at issue were procured and paid for by third parties without an insurable interest in the insureds.

26.     In short, STOLI policies violate insurable interest and anti-wagering laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of the insureds—into cash machines whereby strangers to the insureds are more interested in seeing the insureds dead than alive.

**A.      Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

27.     Beginning in 2001, Coventry became party to a series of requirements contracts through which Coventry was engaged to "originate" Delaware life insurance policies that, from the start, were intended to be transferred to other investors.

28.     Since 2001, U.S. Bank has been a party to this series of contracts with Coventry First, LLC, and other entities, directed at the State of Delaware. A central contract in this arrangement is called the "Life Settlement Policies Origination Agreement" (the "Origination Agreement"), first entered into in October 2001. *See* Life Settlement Policies Origination Agreement dated October 2, 2001; Amended and Restated Life Settlement Policies Origination Agreement dated July 1, 2003; and Life Policies Origination Agreement dated June 29, 2006, each available at *Lavastone Capital LLC v. Coventry First LLC et al.*, No. 1:14-cv-07139-JSR (S.D.N.Y. June 19, 2015) (ECF Nos. 106-41, 106-42).

29.     Pursuant to the Origination Agreement and its related contracts, Coventry became the "Originator" of life insurance policies that were intended from the start (with very few contractual exceptions not applicable here) to end up in the hands of AIG, through the Delaware Titling Trust, for which U.S. Bank, from the start, served as trustee and securities intermediary. *Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 369 F. Supp. 3d 601, 616 (D. Del. 2019) ("[F]acts of which the Court may take judicial notice demonstrate that Coventry, with the help of U.S. Bank, established and directed a program to increase the number of high-value life insurance policies available on the secondary market."); *see also Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2019 WL 2052352, at *2 (D. Del. May 9, 2019) ("[U.S. Bank] admitted in brief that '***U.S. Bank is a party*** to the proffered 'origination agreement' . . . .") (emphasis in original).

30.     The Origination Agreement provides that, with certain exceptions, AIG was required to purchase any life insurance policy Coventry originated. AIG's purchase from Coventry would, in all cases, be facilitated by U.S. Bank, which serves in many different roles including trustee of the Delaware Titling Trust, and fiscal agent and securities intermediary for both Coventry and AIG.

31.     To manufacture such life insurance policies intended for transfer through U.S. Bank, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would create and procure on each insured's life.

32.     Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carrier, thus further adding to Coventry's financial incentive to originate new life insurance policies.

33.     Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or service any life insurance policies on the insured's life, which included, but were not limited to, the power to complete and execute any applications or other documents in connection with the maintenance or liquidation of the policies.

34.     Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. In many cases, if not all, these life expectancy reports were obtained from American Viatical Services, LLC ("AVS"), which was a Coventry "Approved Underwriter" as defined by the Origination Agreements between Coventry, U.S. Bank, and AIG.

35.     Coventry would then use the information provided by AVS to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. The purpose of this underwriting was to, among other things, project how long any potential insured might live, and thus how valuable a particular policy might be.

36.     Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for.

Coventry, with the assistance of local insurance brokers, would start the application process by having these local insurance brokers submit incomplete applications to insurance carriers chosen by Coventry.

37.     Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, and assuming Coventry was still interested in obtaining a policy on that person's life, Coventry would then create and fund a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential policy on the insured's life. Coventry would create and fund this Delaware statutory trust by directing the local insurance broker to have the insured execute a number of non-negotiable Coventry trust documents with a trust nominally funded with $1.00. The trust would have no other assets and it would be established by and for Coventry, and was expressly not intended to serve any valid estate planning need for the insured.

38.     Coventry would also have the insured execute a separate trust agreement whereby Coventry would create and fund a second Delaware statutory trust, called a sub-trust. Under the terms of this sub-trust agreement, all assets of the initial trust were immediately transferred and assigned to the sub-trust, including any and all future rights or interests in any life insurance policy procured by Coventry, through the initial trust, on the insured's life.

39.     With regard to both Delaware statutory trusts, Coventry would choose the trustee, which in most, if not all, cases was Wilmington Trust, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

40. Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware statutory trust in the insured's name as both the owner and beneficiary of the policy being applied for; indicate that the trust had been formed in Delaware; and state that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

41. The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts under which it was engaged to "originate" life insurance policies for resale to other investors i.e., the Origination Agreements among and between Coventry, U.S. Bank, and AIG.

42. The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware statutory trust owner. The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

43. Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

44.     But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware statutory trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" which, on information and belief, is exactly what occurred in the majority of Coventry's transactions. Regardless of whether Coventry acted through a relinquishment or otherwise, it would then typically install itself as the new record holder of the interests in the Delaware statutory trust that owned the policy and the sub-trust, and Coventry would then in effect own the policy.

45.     Coventry would then move forward with the pre-ordained plan of selling and conveying the Delaware trust-owned policy to AIG through U.S. Bank. These conveyances were principally effectuated by way of the Delaware Titling Trust. U.S. Bank, Coventry, and AIG created the Delaware Titling Trust on September 24, 2001, in Delaware pursuant to an agreement between and among them that has been amended and restated numerous times. The Delaware Titling Trust, whose principal place of business is 300 Delaware Avenue, Wilmington, Delaware, was created for the purpose of receiving, aggregated, and holding the life insurance policies Coventry procured as investments for AIG. Since its inception in 2001, U.S. Bank has served as trustee of the Delaware Titling Trust as well as securities intermediary for the Delaware Titling Trust, and U.S. Bank's subsidiary, U.S. Bank Trust N.A., has served as "Delaware Co-Trustee." *See* Life Settlement Policies Origination Agreement dated October 2, 2001; Amended and Restated Life Settlement Policies Origination Agreement dated July 1, 2003; and Life Policies Origination

Agreement dated June 29, 2006, each available at *Lavastone Capital LLC v. Coventry First LLC et al.*, No. 1:14-cv-07139-JSR (S.D.N.Y. June 19, 2015) (ECF Nos. 106-41, 106-42) (defining "Delaware Titling Trust Agreement").

46. In its various capacities pursuant to the Origination Agreements, U.S. Bank facilitated the conveyance of these Delaware trust-owned policies that were intended from the start to be transferred to U.S. Bank and held by U.S. for the benefit of AIG. U.S. Bank did this by, among other things: (a) transferring funds from the Delaware Titling Trust to Coventry; (b) transferring funds from the Delaware Titling Trust to the seller of the policy, which was also an entity controlled by Coventry; (c) transferring the policy and all rights to the Delaware Titling Trust; and (d) having itself named as the new owner and beneficiary of the policy, as securities intermediary for the Delaware Titling Trust. For its role in facilitating these transactions, U.S. Bank was paid a fee as trustee of the Delaware Titling Trust.

47. On information and belief, the arrangement between and among U.S. Bank, Coventry, and AIG resulted in the origination by Coventry of thousands of high-face value life insurance policies (including the Sloat Policy) that were intended—from the start—to be transferred to U.S. Bank and held by U.S. Bank in the Delaware Titling Trust for the benefit of AIG. On information and belief, most (if not all) of these thousands of policies were created as Delaware trust-owned policies. On information and belief, by virtue of serving in so many different capacities in connection with these policies, U.S. Bank was in a unique position to review certain aspects of these transactions (before, during, and after the Sloat transaction), including certain documents showing the close connection these transactions had to Delaware.

48.     Coventry would then convey the Delaware-trust owned policy to its requirements contract counter-party, which was an AIG subsidiary by the name of Lavastone Capital LLC ("Lavastone"), which would either hold the policy until maturity or resell it to another investor.

49.     Coventry was then engaged by Lavastone to "service" the policy until the insured died, which required that Coventry would pay ongoing policy premiums on behalf of the policy's actual owner and Coventry would contact the insured or her family at least once every three months to confirm whether the insured had died yet. Once Coventry learned an insured had died, it would obtain a death certificate and prepare the necessary forms to make a claim for the policy's death benefit.

50.     And as to Coventry specifically, it has been determined that Coventry did not act in "good faith" when it procured policies using its short-term, non-recourse premium finance program. *See Sol*, 369 F. Supp. 3d at 614 ("On the record before the Court, taking the evidence in the light most favorable to Defendant, a reasonable factfinder could only find that the third parties – Coventry, LaSalle, and/or SFG – did not act in good faith.").

### B.      The Application and Issuance of a $10 Million Life Insurance Policy

51.     In March 2005, Union Central Life Insurance Company ("Union Central") received a preliminary inquiry regarding a life insurance policy on the life of Irene Sloat ("Ms. Sloat" or the "Insured"), a Florida resident.

52.     In September 2005, Union Central received a completed "Application for Insurance," (the "Application") seeking a $10 million face amount universal life insurance policy on the life of the Insured, who was then 79 years old. The Application elected Death Benefit Option "C" with a death benefit including the specified face amount and a return of premium. A true and correct copy of the Application, with appropriate redactions of personal identifying information, is attached as Exhibit A.

53.     The Application represented that the Insured had gross annual unearned income (dividends, interest, net real estate income, etc.) of "$300-400," and a net worth of $10 million. *Id.* at 4. The Application identified the purpose of the sought-after policy to be "Estate – Other" with an additional representation that the sought-after policy was for "liquidity for tax." *Id.* at 9.

54.     The Application identified the owner and beneficiary of the proposed policy as "The Irene Sloat Life Insurance Trust," a Delaware trust (the "Trust"). *Id.* at 2.

55.     The Application identified the Trust as a Delaware trust, formed under Delaware law on August 31, 2005, and acting at the direction of a Delaware trustee, Wilmington Trust, located at 1100 North Market Street, Wilmington, DE 19890. *Id.* at 2.

56.     The Application represented that the Insured signed the Application in Jacksonville, Florida, on September 2, 2005. *Id.* at 8.

57.     The Application was also signed on September 2, 2005, in Wilmington, Delaware, by Mr. Scott A. Huff, financial services officer for Wilmington Trust, as trustee of the Trust and owner and beneficiary of the purported policy. *Id.* The Application was also signed by the producer of the policy, David Kossak. *Id.*

58.     The Application also contained declarations that the statements and answers in the Application were complete and true to the best of the signatories' knowledge and belief and that the answers therein were correctly recorded. *Id.*

59.     Thus, in completing the Application, the signatories knew that they were required to provide truthful, accurate, and honest responses to the questions presented. Furthermore, they knew that Union Central would rely upon the statements recorded on the Application in determining whether to issue a policy with the face amount requested, or whether to issue a policy at all.

60.     In reliance upon the representations contained in the Application, and other documents and information submitted to Union Central in connection with the Application, Union Central issued a policy with a death benefit equal to $10 million plus the premiums paid (less any outstanding loans or surrenders) (policy number U000031508) (the "Policy"), with an effective date of September 22, 2005.

61.     On or about September 16, 2005, Union Central received a "Policy Delivery Receipt" executed by the producer, Mr. Kossak, and Mr. Scott A. Huff, financial services officer for the trustee, Wilmington Trust. Upon information and belief, Mr. Huff was an employee in Wilmington Trust's Wilmington, Delaware office and thus, signed the delivery receipt and accepted delivery of the Policy in Wilmington, Delaware.

62.     On or about September 19, 2005, Union Central received a wire transfer in the amount of $927,384.15 from a LaSalle Bank, N.A., bank account for the initial premium under the Policy.

63.     Upon information and belief, and unbeknownst to Union Central at the time, the funds for this premium payment were either provided to the Insured by a third party with no insurable interest in the Insured's life, or were paid by the Insured with the understanding that she would soon afterwards be reimbursed. At no point was the Insured at risk that her own funds would be used to pay premiums on the Policy.

64.     In fact, upon information and belief, and unknown to Union Central at the time, the Policy premiums were paid via a purported Coventry short-term, non-recourse premium finance loan.

65.     Upon information and belief, as part of this purported "loan," the "lender" would reimburse the amount of the initial premium payment, either to the Insured or to the third-party that provided the initial funding.

66.     Upon information and belief, as a result of this purported "loan," neither Ms. Sloat nor anyone with an insurable interest in her life ever provided the funding for any premiums paid on the Policy. The existence of this "loan," however, was not disclosed to Union Central.

67.     Upon information and belief, the purpose of this "loan," and indeed the very purpose of the Policy, was not to provide estate protection or to serve any valid and good faith insurance purpose, but rather to allow strangers with no insurable interest in Ms. Sloat's life to wager on her early demise.

68.     Upon information and belief, U.S. Bank communicated with the Trust and the trustee of the Trust located in Delaware to facilitate the transfer of ownership of the Policy to U.S. Bank.

69.     On or about November 5, 2007, approximately 26-months after issuance and consistent with their pre-existing agreement, Coventry and the Trust submitted to Union Central a request to change the ownership and beneficiary of the Sloat Policy from the Trust to U.S. Bank N.A., as Securities Intermediary, which Union Central processed.

70.     Although unbeknownst to Union Central at the time the Sloat Policy was issued or at the time ownership was changed to U.S. Bank, the Sloat Policy was procured by Coventry, pursuant to its arrangement with U.S. Bank and others, with the intention of transferring the Sloat Policy to U.S. Bank, for the benefit of AIG, to be held in the Delaware Titling Trust for which U.S. Bank served as trustee and securities intermediary, and for which U.S. Bank's subsidiary serves as Delaware co-trustee.

71.     On July 1, 2014, Union Central merged into Ameritas, and as a result, with respect to the Policy, Ameritas is the successor in interest to Union Central.

72.     On March 27, 2022, Ms. Sloat passed away.

73.     On or about April 8, 2022, Ameritas received a claim for the Policy's death benefit by or on behalf of U.S. Bank.

### C.      The Policy was Procured as Part of an Illegal Wagering Scheme to Gamble on the Life of Ms. Sloat

74.     Following receipt of notice of Ms. Sloat's death, Ameritas commenced a review of the purported Policy and has determined, upon information and belief, that it was at all times material hereto meant as an illegal wager on the life of Ms. Sloat. Ameritas has further determined, on information and belief, that the Policy lacked an insurable interest prior to and at its inception and it was procured as an illegal wager on the life of the insured as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional, statutory, and common law prohibitions on wagering. Ameritas has further determined that any appearance of insurable interest was superficial only and was in reality a complete and total sham designed to conceal the true wagering nature of the purported Policy.

75.     Moreover, upon information and belief, the source of the funds for the initial premium payment on the Policy was not Ms. Sloat or any person or valid entity possessing an insurable interest in her life. Instead, the source of the premium was Coventry and/or other persons or entities who lacked an insurable interest in Ms. Sloat's life and were participating in a wager on her life.

76.     Upon information and belief, Coventry procured the Policy through an illegal STOLI scheme, and Coventry lacked a valid insurable interest in the life of Ms. Sloat.

77.     To induce Ms. Sloat to allow the Policy to be procured on her life, Coventry and those acting on its behalf may have represented that the Policy was being procured through a legitimate and legal transaction, or further induced Ms. Sloat with the promise of financial compensation if she permitted the Policy to be procured.

78.     Upon information and belief, Coventry acted through its agent(s) to have an application for the Policy submitted to the insurance company that ultimately issued the Policy.

79.     To facilitate these transactions, Coventry created The Irene Sloat Life Insurance Trust dated August 31, 2005, as a Delaware trust, installed Wilmington Trust as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

80.     The Trust was a sham and used as a cover, because on information and belief it was nominally funded and created as a means to conceal the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Trust lacked any valid insurable interest in the Insured's life.

81.     Upon information and belief, Coventry further created a sub-trust (the "Sub-Trust") to the Trust. The Sub-Trust was also established as a mere cover to procure the Policy without a valid insurable interest.

82.     Upon information and belief, the Policy insuring the life of Ms. Sloat was issued and delivered in Delaware to the Trust, as described above.

83.     Upon information and belief, in connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

84.     This purported "loan" was secured solely by a security interest in the Trust and Sub-Trust that held the Policy.

85.     As a result of this purported "loan," neither Ms. Sloat nor anyone with an insurable interest in her life ever paid any premiums on the Policy. Rather, the loan was used to conceal the fact that such premiums were paid by Coventry for the purpose of creating a wager on Ms. Sloat's life.

86.     Moreover, the purpose of the Policy was not to provide estate protection for Ms. Sloat, but rather she was used as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on her early demise.

87.     Upon information and belief, in connection with the purported "loan" becoming due 26 months after issuance in September 2005, stranger investors unrelated to Ms. Sloat took formal control of the Policy in November 2007.

88.     On or about November 5, 2007, Union Central received and processed a request to transfer the ownership and beneficiary of the Policy from the Trust to U.S. Bank, N.A., as securities intermediary.

89.     Upon information and belief, U.S. Bank acted as securities intermediary and/or as agent in connection with the Policy for Coventry and later for a stranger investor(s) with no insurable interest in Ms. Sloat's life.

90.     None of this was disclosed to Ameritas. Instead, upon information and belief, those seeking to procure the Policy, by design, disguised the true wagering nature of the Policy by, *inter alia*:

- Falsely representing that the Insured had established the Trust in Delaware for a legitimate purpose and that the Policy's purpose was for "Estate - Other" and for "liquidity for tax." Instead, the Trust was established solely for the purpose of serving as a vehicle through which third-party investors would make an illegal wager on the life of the Insured in violation of applicable Delaware law; and

- Taking steps to disguise the true origin of the premium payments which, upon information and belief, were funded by third-party persons or entities other than

(and unrelated to) the Insured, and at no point did the Insured ever intend to use any of her own money fund premiums.

91.     In addition to the above, Coventry and other third-party stranger entities who acted in concert with each other to procure and generate the Policy also took steps after issuance of the Policy so as to further and continually conceal the true wagering nature of the transaction. Upon information and belief, and among other things, this included:

- Maintaining the illusion that the Trust was established by Ms. Sloat as a valid estate planning mechanism and that the Policy was being held by the Trust for those purposes, when in fact the Trust was created solely as a mechanism to allow Coventry and its associates to obtain ownership of the Policy.

- Maintaining the illusion, including in subsequent communications and applications to Ameritas, that the Policy had been procured for valid estate planning purposes.

92.     Upon information and belief, as part of the illegal wagering scheme, Coventry and the other individuals and/or entities acting in concert with each other to generate the Policy misrepresented and otherwise concealed from that, from the outset, the Policy was never intended to benefit anyone with an insurable interest in the Insured's life, but was instead an instrument allowing stranger investors to gamble on her life.

93.     Since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law.

94.     On November 16, 2021, the Delaware Supreme Court issued a unanimous, *en banc* decision in *Lavastone Capital LLC v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Berland*"), which involved certified questions of law arising out a Coventry-procured life insurance policy. In *Berland*, the Delaware Supreme Court held clearly that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes in force." *Id*. at *4.

95.     In so holding, the Delaware Supreme Court in *Berland* reaffirmed its prior unanimous, *en banc* decision in *Price Dawe* which held, *inter alia*, that Delaware has an immense public policy interest in preventing STOLI transactions from coming to fruition. Indeed, as *Price Dawe* held, STOLI policies violate Delaware's Constitution and are, therefore, void *ab initio* and a "fraud on the court" and can never be enforced, and thus assignments of STOLI policies are also void *ab initio* and ineffective as a matter of law. 28 A.3d at 1068 n.25, 1071.

96.     Ameritas has determined, on information and belief, that the Policy was at all times material hereto meant as an illegal wager on the life of Ms. Sloat and it was procured as an illegal wager on the life of the Insured as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional statutory, and common law prohibitions on wagering.

97.     Ameritas has further determined, on information and belief, that the Policy lacked an insurable interest prior to and at its inception, and that any appearance of insurable interest was superficial only and was in reality a complete and total sham designed to conceal the true wagering nature of the Policy.

98.     Ameritas has further determined, on information and belief, that the Trust itself was an illegal sham created to give the false appearance of a valid insurance trust for valid estate planning purposes, and thus give the superficial—but entirely false—appearance of a legitimate insurable interest.

99.     Moreover, upon information and belief, the source of the funds for the initial premium payment on the Policy was not the Insured or any person or valid entity possessing an insurable interest in her life. Instead, the source of the premium was Coventry and/or other associated third-party investors, persons, or entities who lacked an insurable interest in the Insured's life and were participating in a wager on her life

100.    Upon information and belief, the instant Policy was procured pursuant to this Coventry scheme.

101.    Thus, on information and belief, as part of the illegal wagering scheme, the stranger entities acting together to generate the Policy misrepresented and otherwise concealed from Ameritas, at the outset, that Policy was intended to be transferred to a different owner with no insurable interest in the life of Ms. Sloat.

## FIRST CAUSE OF ACTION

## DECLARATORY JUDGMENT – ILLEGAL HUMAN LIFE WAGERING CONTRACT

102.    Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

103.    The Policy was applied for and signed in Delaware by a Delaware statutory trust, as owner and beneficiary of the Policy. The Policy was then actually delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware. The Policy is governed by Delaware law. 18 Del. C. § 2704(e)(4), (g).

104.    The Delaware Constitution provides that "[a]ll forms of gambling are prohibited in this State except [those explicitly set forth in the statute]." Del. Const. Art. II, § 17. Moreover, the Delaware Supreme Court in *Price Dawe* and more recently in *Berland* addressed the issues associated with life insurance policies used to wager on the death of insureds and has held that, under Delaware law, such policies are mere wagering contracts and are void *ab initio*.

105.    As set forth herein, the Policy was, from the outset, procured by Coventry and its agents and other third parties and intended as a wager on the life of Ms. Sloat. Whether Ms. Sloat knew the details of this scheme or her identity was merely used as an instrumentality to procure the Policy, stranger investors were wagering on Ms. Sloat's life and hoping to trigger a secondary market cash-in on the Policy's death benefit.

106. Accordingly, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated the Delaware's Constitution, statutes, common law, and public policy, thus rendering the Policy void *ab initio*.

## SECOND CAUSE OF ACTION

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

107. Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

108. The Policy was intentionally structured to be a "trust-owned insurance policy" as defined by Delaware's insurable interest statute, 18 Del. C. § 2704(e)(4). Because the Policy was delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware, the existence of an insurable interest "shall be governed by [Delaware's insurable interest statute] without regard to [the] insured's state of residency or location." 18 Del. C. § 2704(g)

109. Under Delaware law, only a valid and legitimate insurance trust can have a valid insurable interest in the life of the insured. *See* 18 Del. C. § 2704(c)(5).

110. However, here, because the Trust was an illegitimate cover for the wager on Ms. Sloat's life, the Trust lacked any insurable interest in the life of Ms. Sloat. Accordingly, no insurable interest existed at the time of issuance of the Policy, and the Policy is void *ab initio* for lack of insurable interest.

111. Additionally, the Policy was applied for and issued at the behest of individuals or entities—with no insurable interest in the life of the insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Accordingly, the Policy is void *ab initio* for lack of an insurable interest.

112. Therefore, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy lacked insurable interest because it was procured by and for the benefit of strangers without an insurable interest under Delaware law.

WHEREFORE, Ameritas respectfully requests the entry of an Order by this Court as follows:

A. Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Ms. Sloat;

B. Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

C. Declaring that because the Policy is void *ab initio* it never existed;

D. Awarding Ameritas attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

E. Awarding Ameritas any further relief this Court deems appropriate.

DATED: August 15, 2022     COZEN O'CONNOR P.C.

*/s/ Kaan Ekiner*
Kaan Ekiner (No. 5607)
1201 North Market St., Ste. 1001
Wilmington, DE 19801
Phone: 302-295-2046
Fax: 302-250-4356
kekiner@cozen.com

Joseph Kelleher (*pro hac vice*)
Philip J. Farinella (*pro hac vice*)
Duncan R. Becker (*pro hac vice*)
1650 Market St., Ste. 2800
Philadelphia, PA 19103

*Attorneys for Plaintiff,*
*Ameritas Life Insurance Corp.*