**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERITAS LIFE INSURANCE CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-623-JLH |
| | ) | |
| U.S. BANK, NATIONAL ASSOCIATION, | ) | |
| as Securities Intermediary, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

Kaan Ekiner, COZEN O'CONNOR P.C., Wilmington, Delaware; Joseph M. Kelleher, Brian D. Burack, Phillip J. Farinella, Duncan R. Becker, COZEN O'CONNOR P.C., Philadelphia, Pennsylvania.

 *Attorneys for Plaintiff*

David P. Primack, MANNING GROSS + MASSENBURG LLP, Wilmington, Delaware; Julius A. Rousseau, III, James Westerlind, Lee Pepper, ARENTFOX SCHIFF LLP, New York, New York.

 *Attorneys for Defendant*

Wilmington, Delaware
April 21, 2026

**JENNIFER L. HALL, U.S. DISTRICT JUDGE**

This case involves the phenomenon of stranger-oriented life insurance ("STOLI"), which this Court has written about many times.[1]  Delaware law holds that a person procuring a life insurance policy must have an "insurable interest" in the life of the insured—that is, a reason to want the person to remain alive.  When a person without an insurable interest takes out a life insurance policy on another person, it is referred to as STOLI.  Many states, including Delaware, say that STOLI policies are illegal and void *ab initio* because they constitute unlawful wagers on the lives of the insureds.

The detailed facts of this case are complicated, but the basic story is this:  In the early 2000s, non-parties Coventry[2] and AIG[3] entered into a complex arrangement whereby Coventry and its agents would identify senior citizens meeting certain criteria, and then apply for, purchase, and sell life insurance policies on the seniors' lives to AIG as investments.  In 2005, Irene Sloat

---

[1] *See, e.g., Est. of Frank ex rel. Frank v. GWG DLP Master Tr. Dated 03/01/06*, No. 23-584, 2025 WL 2778520 (D. Del. Mar. 4, 2025); *Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, No. 20-735, 2023 WL 9227098 (D. Del. Oct. 11, 2023); *Ameritas Life Ins. Co. v. U.S. Bank, Nat'l Assoc.*, No. 22-623, 2023 WL 9419169 (D. Del. Oct. 5, 2023) ("*Sloat*"); *Est. of Carmel v. GIII Accumulation Tr.*, No. 21-658, 2023 WL 313931 (D. Del. Jan. 19, 2023); *Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, No. 20-735, 2021 WL 1820573 (D. Del. May 6, 2021), *report and recommendation adopted sub nom. Columbus Life Ins. Co. v. Wilmington Tr. Co.*, No. 20-735, 2021 WL 3886370 (D. Del. Aug. 31, 2021); *Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, No. 20-736, 2021 WL 1820614 (D. Del. May 6, 2021), *report and recommendation adopted*, No. 20-736, 2021 WL 3886373 (D. Del. Aug. 31, 2021); *Est. of Daher v. LSH Co.*, No. 20-360, 2021 WL 184394 (D. Del. Jan. 19, 2021), *report and recommendation adopted sub nom. Daher v. LHS Co.*, No. 20-360, 2021 WL 7416294 (D. Del. Mar. 17, 2021); *Columbus Life Ins. Co. v. Wells Fargo Bank*, No. 20-833, 2021 WL 106919 (D. Del. Jan. 12, 2021).

[2] The Court uses the shorthand "Coventry" to refer to non-party Coventry Capital and related entities.  No party argues that the distinctions between these entities are relevant.

[3] The Court uses the shorthand "AIG" to refer to non-party American International Group, Inc. and related entities including Lavastone Capital LLC (f/k/a AIG Life Settlements, LLC) and AIG Risk Finance.  No party argues that the distinctions between these entities are relevant.

2

learned from her insurance broker, David Kossak, that she could make money by allowing an insurance policy to be taken out on her life for the purpose of selling it to a third party. At Coventry's direction, Delaware statutory trusts were created to apply for and hold the beneficial interest in the policy. Ms. Sloat didn't pay any of the premiums; instead, they were funded by a non-recourse loan from LaSalle Bank that was administered by Coventry and insured by AIG. After the two-year contestability period lapsed, the Sloat policy was sold to Coventry and then to AIG, as was intended from the outset.

In 2011, the Delaware Supreme Court issued its seminal opinion in *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059 (Del. 2011), which confirmed (among other things) that (1) life insurance policies that lack an insurable interest are void *ab initio* and (2) insurers may challenge such policies even after the expiration of the contestability period.

Non-party FCI[4] purchased the Sloat policy in 2017. The price that FCI paid took into account FCI's assessment of the risk that the insurer would challenge the policy and that a court would hold it unenforceable.

In 2022, Ms. Sloat passed away, leading to this dispute over the policy's death benefit and insurance premium payments. Plaintiff Ameritas Life Insurance Group ("Ameritas") is the insurer. Defendant U.S. Bank, N.A. ("U.S. Bank") is the record owner of the policy on Ms. Sloat's life. U.S. Bank holds the policy as a securities intermediary for non-party FCI, which is the beneficial owner of the policy. Pending before the Court are the parties' motions for summary judgment

---

[4] The Court uses the shorthand "FCI" to refer to Financial Credit Investment III SPV-B (Cayman) and related funds owned by private equity firm Apollo Global Management LLC and its affiliates involved in life settlement transactions. (D.I. 168, Ex. 75 at 3851.) No one contends that the distinctions between these entities are relevant.

(D.I. 160, 161) and corresponding submissions (D.I. 162, 163, 164, 165, 166, 167, 168, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189).  Ameritas wants a declaratory judgment that the policy is void *ab initio* and that Ameritas may retain the death benefit and premium payments.  U.S. Bank says the policy isn't void *ab initio*, but even if it is, U.S. Bank is entitled to a refund of the insurance premiums.  Having reviewed the parties' submissions and the applicable law, the Court concludes that Plaintiff Ameritas's motion will be granted and Defendant U.S. Bank's motion will be denied.

## I.    BACKGROUND[5]

### A.    Coventry and AIG Determine that a Life Insurance Policy on Irene Sloat's Life is a Profitable Investment.

This story begins in 2001, when Coventry and AIG entered into a series of agreements that

obliged Coventry to originate[6] life insurance policies meeting AIG's "Eligibility Criteria" that

---

[5] The Court determines that the following facts are not genuinely disputed for summary judgment purposes.  To the extent the parties have contended that any of these facts are disputed, the Court has determined that the dispute is not genuine and/or that the facts establishing the dispute are not properly supported by the record under Federal Rule of Civil Procedure 56(c),(e). The Court recites only the facts necessary for resolving the legal issues presented by the parties' motions.

In a footnote in U.S. Bank's brief and in its Response to Ameritas's Statement of Facts, U.S. Bank makes a conclusory assertion that many of the documents relied on by Ameritas are inadmissible hearsay that the Court cannot consider at summary judgment.  (D.I. 177 at 33 n.76; D.I. 182.)  For several reasons, the Court rejects that argument.  First, arguments made in footnotes, and legal arguments made in statements of fact, are forfeited.  *Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) (explaining that district court was not required to consider argument because "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered [forfeited]"); *Pasquinelli v. HUMBL, LLC*, No. 23-743, 2025 WL 3683266, at *1 n.3 (D. Del. Dec. 19, 2025) (explaining that legal arguments made in a statement of facts are forfeited and collecting cases).  Second, U.S. Bank's arguments are conclusory—U.S. Bank makes no particularized argument with respect to any specific piece of evidence and instead asserts a boilerplate legal conclusion that all the documents are inadmissible with no explanation.  Third, the Court rejects the argument on its merits.  "The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*." *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (cleaned up) (collecting cases).  U.S. Bank doesn't contend that the documents are not authentic and there is no reason to believe that Ameritas would be unable to admit them at trial.

[6] The Agreements define "Originate" to mean:

> [T]he process conducted by [Coventry] of soliciting the sale by the Seller of and purchase by [Coventry] of a Life Policy, including the negotiation, execution and delivery of the agreements, documents and instruments evidencing such transaction and/or evidencing consents, acknowledgments and waivers delivered in connection therewith by the related Insured, any spouse of the Insured, any related beneficiary, any Seller or any third party and the acquisition and verification by [Coventry] of information concerning the related Insured, Seller and Life Policy.

would later be sold to AIG.[7]  (D.I. 166, Ex. 1; Ex. 2 § 2.01(b).)[8]  Coventry recruited Florida insurance agent David Kossak to identify and apply for life insurance policies on seniors' lives meeting Coventry's criteria.  (D.I. 166, Ex. 18 ¶¶ 2–3; D.I. 166, Ex. 19 ("Kossak Dep.") at 213–18.)  At Coventry's instruction, Kossak agreed to identify applicants, compile their medical and financial information, and send that information to Coventry.  (D.I. 166, Ex. 29 § 2.3; Kossak Dep.

---

(D.I. 166, Ex. 2 at C-10.)

[7] Coventry's conduct has resulted in many lawsuits seeking to invalidate STOLI policies issued pursuant to the scheme.  *Sun Life Assur. Co. Canada v. U.S. Bank Nat'l Assoc.*, 369 F. Supp. 3d 601, 616 (D. Del. 2019) ("*Sol*") ("[F]acts of which the Court may take judicial notice demonstrate that Coventry, with the help of U.S. Bank, established and directed a program to increase the number of high-value life insurance policies available on the secondary market."); *see also, e.g.*, *Sun Life Assur. Co. of Canada v. Wells Fargo Bank, N.A.*, 44 F.4th 1024 (7th Cir. 2022) ("*Corwell*"); *Sun Life Assur. Co. of Canada v. U.S. Bank Nat'l Assoc.*, 693 F. App'x 838 (11th Cir. 2017); *Est. of Daher v. LSH CO*, No. 21-3239, 2024 WL 3571642 (C.D. Cal. July 23, 2024); *Est. of Berland ex rel. Gilman v. Lavastone Cap. LLC*, No. 18-2002, 2022 WL 15023450 (D. Del. Sept. 28, 2022) ("*Berland II*"); *Est. of Rink ex rel. Rink v. Vicof II Tr.*, No. 20-39, 2021 WL 6064890 (W.D.N.C. Dec. 20, 2021); *Est. of Malkin v. Wells Fargo Bank, N.A.*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019), *aff'd in part*, *question certified sub nom. Est. of Malkin v. Wells Fargo Bank, NA*, 998 F.3d 1186 (11th Cir. 2021), *certified question answered sub nom. Wells Fargo Bank, N.A. v. Est. of Malkin*, 278 A.3d 53 (Del. 2022), *and aff'd in part, vacated in part, remanded sub nom. Est. of Malkin by Guarnero v. Wells Fargo Bank, NA*, No. 19-14689, 2022 WL 2285884 (11th Cir. June 23, 2022); *U.S. Bank Nat'l Assoc. v. Sun Life Assur. Co. of Canda*, No. 14-4703, 2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016) ("*Van de Wetering*"), *report and recommendation adopted*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017); *Sun Life Assur. Co. of Canada v. U.S. Bank Nat'l Assoc.*, No. 14-62610, 2016 WL 161598 (S.D. Fla. Jan. 14, 2016) ("*Malkin I*"), *aff'd in relevant part*, 693 F. App'x 838 (11th Cir. 2017); *Lavastone Cap. LLC v. Est. of Berland*, 266 A.3d 964 (Del. 2021) ("*Berland I*"); *Est. of Jayson ex rel. Jayson v. U.S. Bank Nat'l Assoc.*, No. N24C-12-216, 2025 WL 2955016 (Del. Super. Ct. Oct. 20, 2025); *Est. of Oristano ex rel. Tuchman v. Avmont, LLC*, No. N23C-04-258, 2024 WL 3876550 (Del. Super. Ct. Aug. 20, 2024); *U.S. Bank, N.A. v. Est. of Albart*, No. 20-762, 2023 WL 7491131 (Fla. Cir. Ct. Oct. 23, 2023); *Est. of Diamond v. U.S. Bank, Nat'l Assoc.*, No. 21-4791, 2023 WL 6392688 (Fla. Cir. Ct. Sept. 15, 2023); *Est. of Barotz ex rel. Barotz v. Vida Longevity Fund, L.P.*, No. N20C-05-144, 2022 WL 16833545 (Del. Super. Ct. Nov. 9, 2022) ("*Barotz I*"), *aff'd sub nom. Vida Longevity Fund, LP v. Est. of Barotz*, 320 A.3d 212 (Del. 2024).

[8] The Court's record citations use the following pincite convention.  If the entire cited exhibit has consistent internal pagination, the Court cites the document's internal pagination.  If not, the Court cites the document's Bates number.  If the exhibit does not have consistent internal pagination or Bates numbers, the Court cites the pagination of the ECF-generated header.

6

at 218–19.)  Upon approval, Kossak would complete and submit the formal life insurance application to an insurer.  (D.I. 166, Ex. 18 ¶ 4.)

In 2005, Kossak presented Florida resident Irene Sloat with a too-good-to-be-true deal: she could take out a life insurance policy on her life at no cost, and then sell the policy for a profit. (D.I. 166, Ex. 18 ¶ 5; Kossak Dep. at 199–204, 207–10, 277.)  Kossak didn't think that Sloat needed more life insurance—she already had two life insurance policies and her estate held millions in assets.  (Kossak Dep. at 42–44, 68–69, 71, 174, 204, 208; D.I. 168, Ex. 31 at 788.)  But Kossak was set to receive commissions from Coventry upon the issuance of the policy and its subsequent sale.  (Kossak Dep. at 71, 219–20; D.I. 166, Ex. 29, Ex. 30.)

Kossak identified Sloat because she met Coventry's criteria as an elderly, wealthy woman with "excess insurability" (meaning that she qualified for additional insurance) but didn't want to buy more with her own funds.  (D.I. 166, Ex. 18 ¶ 5.)  According to Kossak,

> Ms. Sloat was not interested in buying any life insurance for herself (meaning an insurance policy that would pay out to her heirs upon her death).  But she had excess insurability.  So she agreed to participate because she was not responsible for paying any of the premiums or for repaying the loan, and, was interested in allowing investors to obtain a policy on her life in exchange for the possibility of getting some money for allowing them to do it.

(*Id.*)  Under Coventry's program, Sloat wouldn't have to pay the policy premiums with her own funds because they would be funded by a non-recourse loan.  (*Id.* ¶ 3; Kossak Dep. at 179.)  After the policy's two-year contestability period lapsed, Sloat could either pay back the loan and keep the policy herself or she could relinquish the policy to the lender.  (D.I. 166, Ex. 18 ¶ 4.)  According to Kossak and as supported by other documents in the record, Sloat had no interest in paying back the loan and keeping the policy herself because she didn't need it—she didn't intend for the death

7

benefit to be paid to her children, nor did she intend for it to help pay taxes.[9] (Kossak Dep. at 199–204, 207–10, 274–77; D.I. 166, Ex. 18 ¶ 4; D.I. 168, Ex. 28 ¶ 6 (Sloat attesting that the series of transactions involving the policy "are not intended to satisfy [Sloat's] estate planning needs and have not been designed as an estate planning tool").)  But Sloat stood to make a profit when the policy was sold.

At Coventry's instruction, Kossak compiled Sloat's medical records and sent them to Coventry.  (D.I. 168, Ex. 12 at 7; Kossak Dep. at 218–19.)  Using that information, Coventry obtained life expectancy reports to gauge how much longer Sloat would live and whether an insurance policy on her life would be a good investment.  (D.I. 168, Ex. 12 at 7, Ex. 13; Kossak Dep. at 224–26, 231–32.)  Coventry determined that a policy on Sloat's life would only be profitable if it included the "Return of Premium" death benefit option, meaning that upon Sloat's death the insurer would pay out both the policy's death benefit and all of the premiums paid to date.  (D.I. 168, Ex. 31 at 787 (quotation), Ex. 22; Kossak Dep. at 65–66, 185, 211; D.I. 166, Ex. 35 ("Corbett Dep.") at 70–71.)

Coventry then sent that information to AIG, which analyzed whether the proposed policy met AIG's criteria and would be a good investment for AIG.  (D.I. 168, Ex. 13.)  AIG approved the informal application in August 2005.  (D.I. 168, Ex. 14.)  An AIG employee stated that the policy "looks like an excellent case" and has "great" "bullet yields."  (*Id.*)  AIG's records confirm

---

[9] Kossak testified that it was his personal "hope" that Sloat would use the Policy for estate planning purposes, but he repeatedly and consistently explained that Sloat did not share his hope. (Kossak Dep. at 71 ("I knew that she was not likely to purchase the life insurance policy."), 180, 199 (stating that "she didn't want to buy additional life insurance for the reasons that I wanted her to buy the additional life insurance," and agreeing that Sloat's intent was to sell the policy for a profit), 200–04, 207–10.)  And as Kossak subsequently admitted, the Trust was not structured in a way that it could have been used for a legitimate estate planning purpose. (*Id.* at 249–52, 254–55, 274–77.)

that it was intended from the beginning that Sloat would not pay any premiums and that the Policy would be sold after the two-year contestability period lapsed. (D.I. 168, Ex. 40 ("Premiums Paid by Client: $0), Ex. 39 ("Purchase Date: 1/22/2008").)

### B.    Coventry Establishes the Trust, and the Trust Applies for the Policy.

At Coventry's instruction, the Irene Sloat Life Insurance Trust ("Trust") was created to apply for and hold the policy and the premium finance loan. (D.I. 168, Ex. 24; Kossak Dep. at 18 (explaining that the Trust was created "to protect [the investors'] interest in the policy"), 242–43.) The Trust was created as a Delaware statutory trust organized under Delaware law and having a principal place of business in Delaware, and the Trust Agreement included a Delaware choice-of-law clause. (D.I. 168, Ex. 24 ¶¶ 3, 6, 10, 15.) Coventry required the Trust to be organized as a Delaware statutory trust with Wilmington Trust Co., located in Wilmington, Delaware, as the Trustee. (Kossak Dep. at 61–62, 257–58, 260–61; D.I. 168, Ex. 6 at 249, 292–323.)

The Irene Sloat Life Insurance, Premium Finance Sub-Trust ("Sub-Trust") was also created. (D.I. 168, Ex. 25.) The purpose of the Sub-Trust was to (i) take out a loan from LaSalle Bank to finance the Policy's premiums, (ii) hold the Policy as collateral for the loan, and (iii) upon repayment of the loan, terminate the Sub-Trust and allocate the Policy accordingly. (*Id.* § 2.4.) Like the Trust, the Sub-Trust was established under and governed by Delaware law at Coventry's direction. (*Id.* §§ 2.1, 5.2.) The Trust and Sub-Trust documents were all boilerplate agreements pre-negotiated by Coventry, LaSalle Bank, and Wilmington Trust. (D.I. 166, Ex. 6 at 249, 292–323.)

The Trust nominally named Lauren Sloat, Irene's daughter, as beneficial owner and co-trustee. (D.I. 168, Ex. 24.) But Lauren Sloat also executed a "Special Irrevocable Power of Attorney" that appointed Coventry as Lauren Sloat's attorney-in-fact with respect to the Trust and Policy. (D.I. 168, Ex. 27.) As did Irene Sloat. (D.I. 168, Ex. 26.) Thus, Coventry controlled both

9

Irene and Lauren Sloat's ability to apply for, maintain, service, or liquidate any life insurance policies held in the Trust.  (Kossak Dep. at 234–43; D.I. 168, Ex. 26, 27.)  Irene and Lauren Sloat also executed a document attesting that the Trust transactions "are not intended to satisfy [Sloat's] estate planning needs and have not been designed as an estate planning tool."  (D.I. 168, Ex. 28 ¶ 6.)  And the Trust wasn't structured in a way that would enable Sloat to lower her tax bill or achieve other estate planning purposes.  (Kossak Dep. at 249–52, 254–55, 274–77.)

In early September 2005, Kossak's office submitted Sloat's formal application to Union Central, Plaintiff Ameritas's predecessor-in-interest.  (D.I. 168, Ex. 31 ("Application").)  The Application stated that the policy's "Owner" would be the Irene Sloat Life Insurance Trust with an address in Delaware.  (*Id.* at 786.)  It identified one beneficiary: the Trust, located in Delaware.  (*Id.*)  At Coventry's instruction, the Application sought a $10 million universal life policy with a return of premium death benefit option.  (*Id.* at 787; Kossak Dep. at 184–86.)

The Application represented that Sloat had a gross annual unearned income of $300,000 and a household net worth of $10 million.  (D.I. 168, Ex. 31 at 788.)  The policy called for annual premium payments of $791,520.  (D.I. 168, Ex. 33 at 830.)  With an annual income of $300,000, Sloat couldn't pay the $791,520 in annual premium payments herself without liquidating investments, which would've been contrary to a good faith estate planning strategy.[10]  (D.I. 168, Ex. 31 at 6; Kossak Dep. at 101 ("Q: How was Irene Sloat supposed to be able to pay that amount of premium per year if her income was only $250,000 or $300,000 per year?  A: She wasn't."), 186–96.)

---

[10] Kossak believed he could have structured the Policy such that Sloat would have been able to afford the premium payments herself, but he didn't because he was instructed by Coventry not to.  (Kossak Dep. at 184–86.)

The Application's signature line states that it was "[d]ated at" Jacksonville, Florda. (D.I. 168, Ex. 31 at 792.) Sloat signed the Application at her home in Florida. (*Id.*; Kossak Dep. at 73–74.) Kossak then mailed the Application to Delaware to be signed by Wilmington Trust as the owner of the policy. (Kossak Dep. at 74–75, 77, 81–82.) Under the "Owner" section, the Application was signed by Scott Huff, Financial Services Officer for Wilmington Trust, as Trustee. (D.I. 168, Ex. 31 at 792.) Huff signed the Application in Delaware. (D.I. 166, Ex. 32 ("Huff Dep.") at 26, 68, 71; Kossak Dep. at 286.)

### C.  Union Central Issues the Policy.

During the application process, Kossak informed Union Central chief underwriter Ray Picone that the policy premiums would be financed.[11] (Kossak Dep. at 84, 101.) Kossak was confident that the Application would be approved because Union Central had been urging Kossak to submit more applications, including for premium financed policies. (*Id.* at 72, 105.)

Issuing a policy in accordance with the Application was consistent with Union Central's underwriting policies at the time. (Corbett Dep. at 14–15, 67–68, 70–71.) Although the premiums were high, it appeared that Sloat had sufficient assets to pay the premiums either herself or through a premium financed loan. (*Id.* at 30–32.) It was not unusual for an insured with Sloat's age and net worth to seek a premium financed policy or to use trusts. (*Id.* at 32, 62–64, 78–79.) And, at that time, Union Central did not request or review trust documents. (*Id.* at 62–64.) Union Central did not have specific guidelines regarding STOLI policies in 2005, but it reviewed for insurable interest during the underwriting process. (*Id.* at 14–15, 88–89, 93–94.)

---

[11] U.S. Bank cited Kossak's deposition testimony regarding a conversation Kossak says he had with a Union Central representative named Steve McLeod. (D.I. 177 at 5–6.) But McLeod submitted a declaration attesting that Kossak's testimony is "not true" and that McLeod "never spoke with David Kossak about any specific policy, policyowner, applicant, insured, or any specific details about specific applications." (D.I. 181, Ex. 82 ¶ 4.) So whether Kossak and McLeod discussed the policy, and if so, what they discussed, are disputed.

11

Later that month, Union Central issued the Policy.  (D.I. 168, Ex. 33 (the "Policy").)  The Policy stated that "[t]his policy must be delivered promptly as the 20 DAY FREE LOOK PROVISION begins on the date of delivery.  If the policy is delivered and amendments (if any) are signed within 60 days from the later Part I or Part II, no other requirements are necessary." (*Id.* at 829.)  Kossak sent a "Policy Delivery Receipt" to Huff in Delaware, who signed the Policy Delivery Receipt in Delaware on behalf of Wilmington Trust as the "Policyowner."  (D.I. 168, Ex. 36; Kossak Dep. at 93, 299–303; Huff Dep. at 26, 71, 91–93, 99.)

At Coventry's instruction, the Sub-Trust applied for and received a non-recourse loan from LaSalle Bank to fund the premium payments.[12]  (D.I. 168, Ex. 38, Ex. 41.)  Under the Note and Security Agreement, the Sub-Trust provided the Policy as collateral for the loan and acknowledged that the Sub-Trust could satisfy its obligations by relinquishing the Policy.  (D.I. 168, Ex. 41 at 2–3.)  Thus, Sloat would never have any personal liability under the loan—rather than pay it back, she could just relinquish the Policy.  (*Id.*)  Coventry was appointed to act as servicing agent for the loan agreement.  (*Id.* at 4.)

Under another agreement, Coventry purchased all of LaSalle Bank's interest in the loan—including the underlying Policy—for the principal amount of the loan.  (D.I. 168, Ex. 9, Ex. 4.) Coventry was designated LaSalle's power of attorney and executed the loan documents on LaSalle's behalf.  (D.I. 168, Ex. 8 at 81.)  Thus, Coventry effectively funded the loan at inception and owned all rights to the collateral.  And the loan was insured by AIG pursuant to Coventry and

---

[12] Although the Policy states that the annual premium was to be $791,520 (D.I. 168, Ex. 33 at 830), the loan documents funded an annual premium in the amount of $927,384.15 (D.I. 168, Ex. 38, Ex. 41 at 251), which is the amount Coventry paid to Union Central (D.I. 168, Ex. 42). The record does not explain the discrepancy.

12

AIG's "Premium Finance Plus Program" (the "PFP Program"), lowering the risk for LaSalle to issue non-recourse loans.  (D.I. 168, Ex. 3, Ex. 4, Ex. 11.)

With financing and loan insurance secured, Coventry paid the Policy premiums on the Trust's behalf.  (D.I. 168, Ex. 42; Kossak Dep. at 315–16.)  Neither Sloat nor her family ever paid any premiums and they were never liable under the loan.  (Kossak Dep. at 179–80, 303–04.)

In 2006, Union Central issued a memo to its employees regarding STOLI policies.  The memo stated that "Stranger-Owner" life insurance policies were "objectionable," but that there were "certain situations in which a life settlement could be a viable option" for policies "not purchased for the purpose of selling or assigning [the policies] to a life settlement company."  (D.I. 179, Ex. 87 at 4332.)  The memo indicated that Union Central's approved life settlement provider was Coventry, and stated that "participation in any transaction that involves the sale of a life policy with the intent to sell it to a stranger/investor is not permitted."  (*Id.*)

### D.    As Expected, the Policy is Sold to Coventry and then AIG.

As anticipated from the outset, the Policy was sold to Coventry in 2007, after the two-year contestability period lapsed.  (D.I. 168, Ex. 50.)  Pursuant to the agreements between Coventry, AIG, and U.S. Bank, AIG completed a pre-offer review of the Policy and recommended that it be purchased.  (D.I. 168, Ex. 45, 46.)  Coventry offered to buy the Policy, and the Policy was sold to Coventry in October 2007.  (D.I. 168, Ex. 47, 50, 53.)  In connection with the transaction, Coventry wired the Trust $50,000 as payment for the Sloat family's participation in the scheme.  (D.I. 168, Ex. 51, Ex. 53, Ex. 54 at II-1; Kossak Dep. at 324–25.)

In November 2007, Coventry, AIG, and U.S. Bank executed a "Tripartite Entitlement Order" providing that, upon payment to Coventry, U.S. Bank would transfer the Policy from Coventry's account to AIG's account and into a Titling Trust that held policies owned by AIG.  (D.I. 168, Ex. 55.)  Later that month, at U.S. Bank's request, Union Central changed the owner

and beneficiary of the Policy to U.S. Bank, N.A., as Securities Intermediary. (D.I. 168, Ex. 56 at 2–3; D.I. 179, Ex. 24 at 437–39.)

In 2015, Kossak pled guilty to a one-count Information charging him with bank fraud, in violation of 18 U.S.C. § 1344. (D.I. 179, Ex. 54.) The Information and plea agreement reflect that Kossak admitted to falsely reporting his clients' net worth to insurance companies to obtain policies for which they otherwise wouldn't have qualified, and that he defrauded La Salle Bank by assigning such a fraudulently-obtained $10 million policy as collateral for premium financing for the policy. (D.I. 179, Ex. 54 at 17–18; Ex. 53 at 1–4.) The record reflects that the charged conduct related to Kossak's actions in obtaining the Sloat Policy, though the summary judgment record does not contain the details about what Kossak lied about. (D.I. 179, Ex. 54 at 17–18; Ex. 52.) Ameritas subsequently terminated Kossak's status as an Ameritas agent.[13] (D.I. 179, Ex. 61, 60.)

**E.    FCI Determines that the Policy is a Good Investment and Buys it from AIG.**

In 2016, after settling a lawsuit with Coventry, AIG sought to sell its life settlement portfolio. (D.I. 179, Ex. 110 ("Powers Dep.") at 82–84; D.I. 166, Ex. 66 at 2.) AIG bundled its policies into tranches and marketed those tranches to potential buyers. (Powers Dep. at 84; D.I. 166, Ex. 66 at 11.) In 2017, AIG began negotiating with an investment fund called FCI for the sale of a tranche of policies called the "Platinum Portfolio," which contained the Sloat Policy. (Powers Dep. at 84–86; D.I. 166, Ex. 66 at 11.) The Platinum Portfolio contained approximately 2,800 policies with a face amount totaling approximately $8 billion. (Powers Dep. at 89–90.)

FCI is a sophisticated investment firm owned by the private equity giant Apollo Global Management LLC. (D.I. 168, Ex. 69 at 1; D.I. 166, Ex. 68.) FCI "aims to deliver low-correlated, attractive risk-adjusted returns typically unavailable in the marketplace by investing primarily in

---

[13] The record does not indicate when Union Central became Ameritas.

senior life settlements" with an investment strategy that is "opportunistic and value-driven, backed by long-term fundamental analysis and best in-class longevity underwriting expertise." (D.I. 168, Ex. 69 at 2.) As of July 2017, FCI was already "the largest dedicated life settlement fund raised to date." (*Id.*)

At the time FCI was negotiating with AIG for the purchase of the Platinum Portfolio in 2017, FCI knew there was a chance that some of the policies in that portfolio would be held to be unenforceable. In 2016, two federal district courts held that life insurance policies issued from the same Coventry program on similar facts as the Sloat Policy (and nominally owned by U.S. Bank as securities intermediary for the true beneficial owners) lacked insurable interests under Delaware law. *U.S. Bank Nat'l Assoc. v. Sun Life Assur. Co. of Canda*, No. 14-4703, 2016 WL 8116141, at *17–19 (E.D.N.Y. Aug. 30, 2016) ("*Van de Wetering*"), *report and recommendation adopted*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017); *Sun Life Assur. Co. of Canada v. U.S. Bank Nat'l Assoc.*, No. 14-62610, 2016 WL 161598, at *14–18 (S.D. Fla. Jan. 14, 2016) ("*Malkin I*"), *aff'd in relevant part*, 693 F. App'x 838 (11th Cir. 2017). FCI knew about these cases. (Powers Dep. at 145–46, 158, 273–74, 277.) And in January 2017, Sun Life Assurance Company of Canada filed a complaint against U.S. Bank (as securities intermediary for FCI) seeking a declaratory judgment that an insurance policy on the life of Harriet Sol was void *ab initio*. *Sun Life Assur. Co. of Canada v. U.S. Bank Nat'l Assoc.*, 369 F. Supp. 3d 601 (D. Del. 2019) ("*Sol*"); *Sun Life Assur. Co. of Canada v. U.S. Bank Nat'l Assoc.*, No. 17-75, 2019 WL 8353393, at *1 (D. Del. Dec 30, 2019) (stating that the Sol policy was owned by FCI). The *Sol* policy originated from the same Coventry program at issue here, and the relevant facts regarding the *Sol* policy's underwriting and issuance are nearly identical. FCI was aware of the *Sol* complaint. (Powers Dep. at 145–46, 273–74 (stating that FCI became aware of the *Sol* case "[s]hortly after the litigation commenced"), 294.)

15

FCI conducted due diligence on the individual policies in the Platinum Portfolio, including reviewing for "Insurable Interest Risk." (D.I. 168, Ex. 74 at 74.) For policies identified as "High Risk," FCI's Due Diligence Summary states, "Complete our standard due diligence (~80 questions covered). Review all closing documents, policies, ownership documents, chain of title, and look at Insurable Interest Risk, Contestability Risk, Title Risk, Servicing Risk and other considerations such as PF, BI, or other potential issues." (*Id.*) The "Insurable Interest Risk" analysis was conducted by FCI's legal counsel. (Powers Dep. at 107–111, 114–17.)

FCI obtained and reviewed all of the relevant documentation regarding each policy's history, including the origination, financing, trust, and sale documents. (*Id.* at 61–65, 94–95, 97, 115–16, 122, 167, 178, 180, 277–78.) AIG provided FCI with all "Material Documents," including the Policy, the Application, change of ownership documents, "any Premium Finance Document" relating to the Policy, "any trust agreement and all amendments thereto" regarding the Policy, as well as the "Policy Settlement Documents" including "all powers of attorney or authorizations[.]" (D.I. 168, Ex. 75 at 3855, 3857, § 3.5(c), (d).)

FCI knew that the policies in the Platinum Portfolio were originated by Coventry and knew the details of Coventry's scheme, including its use of Delaware trusts. (Powers Dep. at 90, 220, 236–37.) FCI knew that Coventry's plan all along was to sell the policies in the secondary market. (*Id.* at 220, 265–66.) FCI knew about the PFP program wherein AIG provided insurance for non-recourse loans from LaSalle Bank to finance premium payments. (*Id.* at 90–92, 159, 176–77.) And FCI knew that Coventry-originated policies financed by non-recourse loans pursuant to the PFP program were involved in litigation and that there was a risk they'd be declared unenforceable for lack of insurable interest. (*Id.* at 144–45 (stating that "[p]olicies with a history of premium financing" required "further investigation regarding the relationship between the beneficiaries of

16

the policy" including the "insurable interest relationship" and that "we found that policies that have a history of premium financing have in the past tended to attract some litigation"), 145–46 (agreeing that FCI was aware of the *Sol* case filed in 2017 involving a policy "procured through the same premium financing program as the Sloat policy, and it was beneficially owned by an FCI entity"), 158 (agreeing that in August 2017 FCI was "aware that there were litigations involving Coventry PFP policies"), 273–74 (agreeing that FCI was aware of the *Malkin I*, *Van de Wetering*, and *Sol* litigations), 275–77 (stating that FCI's insurable interest analysis took into account "the extent that any policy could be potentially impacted by litigation").)

FCI assessed each policy's legal risks, including insurable interest risk, under the applicable state law. (Powers Dep. at 134, 166 ("There was analysis performed by our counsel meant to determine the potential legal framework for establishing insurable interest and other life settlement law in specific jurisdictions[,]"), 208 (explaining that one factor considered is "whether the policy was issued in one of the states that was identified in legal analysis").) Based on that analysis, FCI assigned each policy a legal risk tier, with a legal risk tier of 4 representing the highest risk.[14] (D.I. 168, Ex. 74 at 74 (FCI document designating as "High risk" policies that are "Identified as [PFP] Program by AIG" and entailed a large death benefit "in a tier 3 or 4 state"); Powers Dep. at 208–09.) For high legal risk policies, FCI applied a "haircut," meaning a discount in the price offered to reflect the heightened legal risk. (Powers Dep. at 128–29, 130 ("Depending on various factors, including advice of counsel, in certain circumstances, we may potentially include some stress in our pricing to compensate for the potential risk of lawsuits related to certain policies."), 199–200 ("Q: Does the legal risk impact the allocated purchase price? A: Legal risk

_____

[14] Only about 80 policies out of the approximately 2,800 in the portfolio were assigned a legal risk tier of 4. (D.I. 168, Ex. 73; Powers Dep. at 139–40.)

and to the extent that there were any potential haircuts for potential litigation would be potentially included in the allocated purchase price."), 208–09.)

FCI's assessment assumed that the Sloat Policy was issued in Delaware. (D.I. 168, Ex. 73, Ex. 74 at 77; Powers Dep. at 178, 208–09.) Because of that, and because of other factors, including that it was premium-financed, FCI assigned the Sloat Policy the highest legal risk tier of 4. (Powers Dep. at 142–43 (explaining that the Sloat Policy was "categorized [] as tier 4 legal risk" based on "a number of factors" including "that the policy has a history of premium financing, which requires a bit of a different analysis at the time the policy was originated to ensure the insurable interest would have existed at the time the policy was issued," and the policy's "issue state"), 208–09.) And FCI applied a discount to the purchase price of the Sloat Policy to account for that increased legal risk. (*Id.* at 208 ("If the Sloat policy was a tier 4 state in our pricing model, there would have been a haircut applied respecting that level of legal stress."), 209 (agreeing that the Sloat Policy was assigned a legal risk tier of 4 and further stating that "[t]ier 4 legal risk would have been the category that captured a potential legal stress in our pricing"), 245–26 ("Q: So a premium finance discount was applied to the valuation of the Sloat policy; is that correct?   A: Yes.").)

In sum, at the time FCI was considering purchasing the Sloat Policy in 2017, FCI (i) knew that insurers were challenging policies issued under similar circumstances, (ii) knew that courts had declared policies issued on similar facts to be void *ab initio* for lack of an insurable interest, and (iii) factored its assessment of the likelihood that the Policy would be found invalid under Delaware law into the purchase price and received a discount for that risk.

In September 2017, FCI and AIG consummated the sale of the Platinum Portfolio, including the Sloat Policy. (D.I. 168, Ex. 75 at 3754, 3850.) FCI purchased the portfolio for nearly

$2 billion.  (*Id.* at 3863 (providing for a Purchase Price of "$1,874,956,372.91")).)  The "Allocated Purchase Price" for the Sloat Policy was $5,442,363.  (*Id.* at 3754.)  FCI did not seek a representation from AIG that the policies in the Platinum Portfolio were supported by an insurable interest at inception.  (Powers Dep. at 218–19, 222.)

U.S. Bank was instructed to transfer the Policy from AIG's account to FCI's.  (D.I. 168, Ex. 76 at 89–90.)  Because U.S. Bank remained the "Securities Intermediary" on behalf of the Policy's beneficial owner (now FCI), no documentation memorializing the change in beneficial owner was submitted to Ameritas.

During the life of the Policy, Union Central, and later Ameritas, issued routine premium notices to U.S. Bank as securities intermediary for the Policy's beneficial owner.  (D.I. 179, Exs. 7–10.)  Ameritas issued annual reports representing that the Policy remained in force (D.I. 179, Exs. 11–21), and it telephonically verified the Policy's status to a U.S. Bank/FCI representative on numerous occasions (D.I. 179, Ex. 22; D.I. 166, Ex. 34 at 45).  None of these communications expressly represented that the Policy had an insurable interest at inception or that Ameritas had conducted an assessment of insurable interest.  (Powers Dep. at 218–19, 222–23.)  FCI never asked Ameritas whether Ameritas believed that the Policy was supported by an insurable interest at inception.  (*Id.* at 297–98.)

In 2022, Sloat passed away.  (D.I. 179, Ex. 38 at 821.)  A U.S. Bank representative submitted a death claim to Ameritas on FCI's behalf.  (D.I. 179, Ex. 36.)  Due to the size of the claim, Sloat's age at the time the Policy issued, and the fact that ownership changed shortly after the contestability period lapsed, Ameritas began an investigation in accordance with its policies.  (D.I. 179, Ex. 37, Ex. 103 "Farmen Dep." at 18.)  In a 2022 email, an Ameritas employee remarked that the Policy was "likely STOLI" and attached a 2007 internal Union Central email reporting

19

that the Policy had been sold to Coventry after the contestability period had expired. (D.I. 179, Ex. 42.)

Ameritas then sued U.S. Bank in its capacity as securities intermediary for the Policy's beneficial owner, seeking a declaratory judgment that the Policy is an illegal wager on a stranger's life and lacks an insurable interest. (D.I. 1.) The operative complaint is the First Amended Complaint. (D.I. 25 ("FAC").) U.S. Bank moved to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6) (D.I. 37), which the Court denied (D.I. 86). U.S. Bank's operative pleading is the First Amended Answer to the First Amended Complaint with Counterclaims. (D.I. 90.) After the close of discovery, the parties filed motions for summary judgment. (D.I. 160, 161.)

## II.    LEGAL STANDARD

A party may move for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"An assertion that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials,' or by 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Resop v. Deallie*, No. 15-626-LPS, 2017 WL 3586863, at *1 (D. Del. Aug. 18, 2017) (quoting Fed. R. Civ. P. 56(c)(1)(A) & (B)). The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*

20

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  But a factual dispute is only genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To withstand a motion for summary judgment, the non-moving party "must point to concrete evidence in the record that supports each and every essential element of his case." *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").  "[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007)).

## III.    DISCUSSION

The Court's opinion proceeds as follows.  The Court first concludes that Delaware law applies.  Applying Delaware law, the Court determines that no reasonable fact finder could find that the Policy was supported by an insurable interest at inception.  The Court next concludes that no reasonable fact finder could find that U.S. Bank is entitled to a return of any premiums.  Finally, the Court determines that U.S. Bank's remaining counterclaims fail.

### A.    Delaware Law Applies.

Both sides devote a major portion of their summary judgment briefing to a dispute about whether Delaware or Florida law applies to Ameritas's challenge to the enforceability of the Sloat Policy.  The parties say it matters because, under Delaware law, a STOLI policy is void *ab initio*, which means that an insurer can challenge its enforcement even after the contractual contestability

period has expired.  *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel. Christiana Bank & Tr. Co.*, 28 A.3d 1059, 1065 (Del. 2011).  Whereas the Florida Supreme Court had held that such challenges could not be brought after the contestability period.  *See Wells Fargo Bank, N.A. v. Pruco Life Ins. Co.*, 200 So.3d 1202, 1206–07 (Fla. 2016), *superseded by* Fla. Stat. Ann. § 626.99291 (2017).

In a diversity case, the Court applies the forum state's conflict of law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Delaware has adopted the rules set forth in the Restatement (Second) of Conflict of Laws.  *In re Peierls Fam. Inter Vivos Trusts*, 77 A.3d 249, 255 (Del. 2013).  The Restatement directs that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law."  Restatement (Second) of Conflict of Laws § 6 (1971); *In re Peierls*, 77 A.3d at 255.  Absent a statutory directive, Delaware courts apply a three-step framework set forth in the Restatement.  *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017).

In this case, there is a statutory directive that requires the application of Delaware law. Delaware's insurable interest statute, 18 Del. C. § 2704, prohibits insurance contracts that lack an insurable interest, and it says that the existence of an insurable interest of a trust-owned policy shall be "governed by this section" (*i.e.*, Delaware law) if the policy was "issued for delivery" and "delivered to the place of business in Delaware of the trustee" of a Delaware trust, "without regard to an insured's state of residency or location."  18 Del. C. § 2704(a), (e), (g).

Here, there is no legitimate dispute that the Policy's "Applicant" and "Owner" was a Delaware trust with a trustee located in Delaware.  (D.I. 168, Ex. 31 at 786, 792; Ex. 33 at 836; Ex. 24 ¶ 3, 5; Kossak Dep. at 297–98; Huff Dep. at 82–83.)  The uncontroverted evidence shows that Union Central (Ameritas's predecessor) issued the Policy to Wilmington Trust, that Union

22

Central instructed Kossak to deliver the Policy to Wilmington Trust, that Kossak in fact delivered the Policy to Wilmington Trust in Delaware, and that Wilmington Trust signed the "Policy Delivery Receipt" in Delaware.  (D.I. 168, Exs. 33, 36; Kossak Dep. at 93, 299–303; Huff Dep. at 26, 71, 91–93, 99; D.I. 163 (Ameritas's Concise Statement of Facts) ¶ 14; D.I. 182 (U.S. Bank's Response to Ameritas's Concise Statement of Facts) ¶ 14.)  Thus, under § 2704(g), Delaware law applies to Ameritas's challenge to the enforceability of the Policy.[15]

### B.        The Policy is Void *Ab Initio*.

The next issue the Court must confront is whether, under Delaware law, the Policy had an insurable interest at inception.   Ameritas seeks summary judgment that the Policy lacked an

---

[15] U.S. Bank cites several non-binding out-of-state cases, but all are distinguishable.  Those cases rely on the proposition that a policy is "issued for delivery" in the state where the insured risk is located.  (D.I. 163 at 22–23.)  But the Delaware insurance code and the Restatement (Second) of Conflict of Laws say that the insured's location is immaterial to the choice of law where the policy is not issued to the person whose life is insured.   18 Del. C. § 2704(g); Restatement (Second) of Conflict of Laws § 192 cmt. a.

U.S. Bank contends that Union Central issued the Policy on its Florida forms and assumed that the Policy was governed by Florida law.  U.S. Bank also points out that Kossak wasn't authorized to sell insurance in Delaware.  Even assuming those facts are true, they are immaterial to the choice of law analysis because a Delaware statute says that Delaware law applies in this situation.

Because a Delaware statute requires the application of Delaware law to Ameritas's challenge to the enforceability of the Policy, I need not apply the three-step choice of law framework set forth in *Chemtura*, and I therefore need not reach U.S. Bank's argument that the Policy's Conformity of Laws provision operates as a choice of laws provision that requires the application of Florida law.  But if I did reach that issue, I would reject U.S. Bank's argument.  *See Stillwater Mining Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 20C-04-190, 2021 WL 6068046, at *10 (Del. Super. Ct. Dec. 22, 2021) ("A conformity clause alone is not a choice of law provision."), *aff'd* 289 A.3d 1274 (Del. 2023); *see also Est. of Berland by Gilman v. Lavastone Cap. LLC*, No. 18-2002, 2022 WL 15023450, at *3 (D. Del. Sept. 28, 2022) ("*Berland II*") (rejecting argument that conformity with laws provision mandated application of Florida law on nearly identical facts); *cf. AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 133 (2d Cir. 2018) (concluding that a nearly identical provision in a life insurance contract was not a choice of law clause).

insurable interest at inception.  I agree with Ameritas that, on this record, no reasonable fact finder could conclude that the Policy had an insurable interest at inception.

As already explained, Delaware law requires that life insurance policies must be procured by a person or entity with an insurable interest in the insured.  18 Del. C. § 2704(a).  A policy lacking an insurable interest at inception "is void *ab initio*" and "[n]ever legally came into effect." *Price Dawe*, 28 A.3d at 1067–68.  A policy contains an insurable interest at inception "so long as [1] the insured procured or effected the policy and [2] the policy is not a mere cover for a wager." *Id.* at 1068.  To determine who "procured" the policy, the Delaware Supreme Court says that courts should examine "who pays the premiums." *Id.* at 1075.  "[I]f a third party funds the premium payments by providing the insured the financial means to purchase the policy then the insured does not procure or affect the policy." *Id.* at 1076.  And although the use of a nonrecourse loan to fund premiums is not dispositive, a trust-owned life insurance policy is void "[i]f the use of nonrecourse funding allows the insured—individually or as settlor or grantor of a trust—to obtain the policy 'without actually paying the premiums.'" *Lavastone Cap. LLC v. Est. of Berland*, 266 A.3d 964, 972 (Del. 2021) ("*Berland I*") (quoting *Price Dawe*, 28 A.3d at 1076).

On this record, no reasonable fact finder could conclude that the Sloat Policy had an insurable interest at inception.  The undisputed facts about the arrangements to fund the Policy show that it was an unlawful wager on Mrs. Sloat's life.  Mrs. Sloat did not pay the premiums and did not procure the Policy.  The premiums were paid with funds obtained via a nonrecourse loan provided by LaSalle Bank and controlled by Coventry.  Once the loan came due, the Policy was sold to Coventry, using the proceeds to repay the loan.  Neither Sloat herself, her family, nor the Trust ever made any premium payments and were never liable under the loan.  And there is no evidence that would allow a reasonable fact finder to conclude that Mrs. Sloat procured the Policy

24

"in good faith, for a lawful insurance purpose." *Berland I*, 266 A.3d at 973. Under these circumstances, no reasonable fact finder could conclude anything but the Policy was a cover for a wager made in connection with the Coventry STOLI scheme.

Many courts have granted summary judgment of unenforceability under Delaware law on nearly identical facts. Indeed, every court that has considered a policy produced by the Coventry scheme under Delaware law has held that it is void *ab initio*. *See, e.g.*, *Est. of Barotz by Barotz v. Martha Barotz 2006-1 Ins. Tr.*, No. 20C-04-126, 2023 WL 8714990, at *9–10 (Del. Super. Ct. Dec. 18, 2023) ("*Barotz II*") (granting summary judgment that policy was void on similar facts); *Est. of Barotz by Barotz v. Vida Longevity Fund, L.P.*, No. N20C-05-144, 2022 WL 16833545, at *7–10 (Del. Super. Ct. Nov. 9, 2022) ("*Barotz I*") (same), *aff'd sub nom. Vida Longevity Fund, LP v. Est. of Barotz*, 320 A.3d 212 (Del. 2024); *Berland II*, 2022 WL 15023450, at *4–5 (granting summary judgment that policy obtained through Coventry program lacked insurable interest); *Sol*, 369 F. Supp. 3d at 610–11 (same); *Van de Wetering*, 2016 WL 8116141, at *18 (same).[16]

## C.     U.S. Bank is Not Entitled to the Return of Premiums Paid by FCI or Others.

Ameritas next seeks summary judgment that U.S. Bank is not entitled to the return of any premium payments made to Ameritas.[17] To determine whether the beneficiary of an unenforceable

---

[16] I summarily reject U.S. Bank's argument that 18 Del. C. § 2718(a) requires this Court to hold the Policy enforceable. That statute says that "[a] policy hereafter delivered or issued for delivery to any person in this State in violation of [the Delaware Insurance Code] but otherwise binding on the insurer shall be held valid, but shall be construed as provided in this title." 18 Del. C. § 2718(a). According to U.S. Bank, Union Central violated various aspects of the Delaware Insurance Code when it issued the Policy, so the Court is required to "h[o]ld [it] valid" even though it otherwise lacks an insurable interest. The argument borders on frivolous (if not crosses the line) for several reasons, not the least of which is that it is contrary to *Price Dawe*. *Price Dawe*, 28 A.3d at 1067 ("A court may never enforce agreements void *ab initio*.").

[17] The Court assumes without deciding that a securities intermediary may seek the return of premiums paid by a policy's current beneficial owner. *But see Sun Life Assur. Co. of Canada v. Wells Fargo Bank, N.A.*, 44 F.4th 1024, 1038 (7th Cir. 2022) ("*Corwell*") (explaining that a

STOLI policy is entitled to a refund of insurance premiums—*i.e.*, restitution—Delaware courts apply §§ 197, 198, and 199 of the Restatement (Second) of Contracts.  *Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 72 (Del. 2022) ("*Seck I*").

Section 197 of the Restatement, titled "Restitution Generally Unavailable," establishes the general rule that "courts typically will not allow any party to obtain any remedy, including restitution" when a contract is found to be illegal.  *Id.* at 68; Restatement (Second) of Contracts § 197.  Sections 197, 198, and 199 set forth the exceptions to that general rule.  *Seck I*, 284 A.3d at 68; Restatement (Second) of Contracts §§ 197–199.

In response to Ameritas's request for summary judgment that it does not owe restitution, U.S. Bank asserts that there are disputes of material fact that preclude summary judgment regarding (1) whether it would be a "disproportionate forfeiture" to allow Ameritas to retain the

---

securities intermediary could not recover premiums paid by a policy's current beneficial owner because the securities intermediary "has no entitlement in its individual capacity to recover any of the premiums it paid").  U.S. Bank has not cited authority or identified evidence in the summary judgment record to support its assertion that it has the authority to assert a claim for restitution on FCI's behalf for premium payments made by FCI.

The Court is also skeptical of U.S. Bank's assertion that it may seek restitution reflecting premiums paid by prior beneficial owners of the Policy.  According to U.S. Bank, "the Policy's beneficial owner [FCI] acquired the rights of the prior beneficial owner to all premiums paid for the Policy, and is asserting a claim to those payments."  (D.I. 177 at 31 n.73 (that's right—73 footnotes), 39.)  In support of its assertion, U.S. Bank cites a "Purchase and Sale Agreement" between FCI and two AIG entities.  (D.I. 179, Ex. 123 at 3846.)  U.S. Bank points to § 2.1(a)(ii) of the agreement, which provides that "[FCI] shall purchase, acquire and accept from [AIG] and each Titling Trust at the Closing, all of the rights, title and interest of the Seller and each Titling Trust in, to and under the Purchased Assets" and goes on to define "Purchased Assets" to include "all premiums paid with respect to such Policy."  (*Id.* at 3862.)  That provision says that FCI receives a right to the premiums paid by AIG.  It does not say that FCI has assigned that right, or any rights to restitution, to U.S. Bank.  Indeed, U.S. Bank is not even a party to the agreement. U.S. Bank does not point to any evidence supporting its position that it may assert FCI's claims here.

In any event, the Court does not need to reach the issue of whether U.S. Bank is entitled to seek restitution of any premium payments because any such claim to restitution fails on the merits.

26

premium payments (D.I. 177 at 39–40) and (2) whether Ameritas is "more at fault" than FCI and the prior beneficial owners (*id.* at 31–39).  The Court takes each argument in turn.

> **1.     No reasonable fact finder could conclude that FCI would suffer a disproportionate forfeiture if it were denied restitution.**

U.S. Bank argues that it would be a "disproportionate forfeiture" to allow Ameritas to retain premium payments paid by FCI and the prior beneficial owners.  U.S. Bank's argument implicates the exception set forth in § 197 of the Restatement, which provides as follows:

> Except as stated in §§ 198 and 199, a party has no claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy unless denial of restitution would cause disproportionate forfeiture.

Restatement (Second) of Contracts § 197.  A Comment to § 197 explains as follows:

> *a. Rationale.* In general, if a court will not, on grounds of public policy, aid a promisee by enforcing the promise, it will not aid him by granting him restitution for performance that he has rendered in return for the unenforceable promise.  Neither will it aid the promisor by allowing a claim in restitution for performance that he has rendered under the unenforceable promise.  It will simply leave both parties as it finds them, even though this may result in one of them retaining a benefit that he has received as a result of the transaction.

*Id.*, cmt. a.  Another Comment discusses the "disproportionate forfeiture exception":

> *b. Exceptions.* . . .  [T]he rule is subject to the exception stated in this Section that allows restitution in favor of a party who would otherwise suffer a forfeiture that is disproportionate in relation to the contravention of public policy involved.  Account will be taken of such factors as the extent of the party's deliberate involvement in any misconduct, the gravity of that misconduct, and the strength of the public policy. . . .  Here . . . the term "forfeiture" is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance, on the expectation of that exchange . . . .  Whether the forfeiture is "disproportionate" for the purposes of this Section will depend on the extent of that denial of compensation as compared with the gravity of the public interest involved and the extent of the contravention.  If the claimant has

27

> threatened grave social harm, no forfeiture will be disproportionate . . . .

*Id.*, cmt. b; *Seck I*, 284 A.3d at 69 ("[W]hether a forfeiture is disproportionate depends both on the actions of the claimant, as well as the nature of the public policy involved.").

U.S. Bank's argument about why it would suffer a disproportionate forfeiture if it weren't able to recover the premiums is conclusory, but it seems to suggest that the exception applies here because Ameritas is "more at fault" than FCI and the prior beneficial owners of the policy. But the disproportionate forfeiture exception does not compare the parties' degrees of fault. Rather, it asks for a comparison of the actions of the party seeking restitution—that is, FCI's conduct in purchasing the Policy—with the gravity of the public interest involved—that is, Delaware's strong public interest in preventing wagers on seniors' lives and ensuring that such wagers don't pay off.

No reasonable fact finder could conclude on this record that FCI would suffer a disproportionate forfeiture. FCI is a sophisticated investment firm. It is the largest owner of life settlements in the world. When FCI purchased the "Platinum Portfolio" tranche of policies that included the Sloat Policy in 2017, Delaware's public policy against wagers on the lives of strangers was well-established in the case law, and courts had invalidated similar policies on nearly identical facts. FCI did extensive due diligence before purchasing the Platinum Portfolio, and FCI knew that the Policy had been obtained through the Coventry program using premium financing.

Did FCI "know" at the time it purchased the Sloat Policy that a court would later hold it unenforceable? No one can predict with 100% accuracy how a court case will come out. But FCI gambled on what a court would do: it is undisputed that the purchase price that FCI paid took into account *FCI's own assessment* of the high risk that the Policy would be found to be unenforceable STOLI. FCI applied a pricing "haircut" to account for that risk. On these facts, any "forfeiture"

28

suffered by FCI by being denied restitution is entirely proportionate to its conduct in making the wager.

In sum, FCI made a bet when it bought the Policy.  It priced into its wager the odds that the Policy was itself an illegal bet on the life of a senior citizen.  FCI lost. That is not a disproportionate forfeiture.

### 2.     No reasonable fact finder could conclude that Ameritas was more at fault than FCI.

U.S. Bank next argues that there is a dispute of fact about whether Ameritas is "more at fault" than FCI.  U.S. Bank's argument implicates the exception set forth in § 198(b) of the Restatement, which provides as follows:

> A party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if . . . he was not equally in the wrong with the promisor.

Restatement (Second) of Contracts § 198(b).  Put another way, if the parties to the illegal contract are "equally in the wrong," no party has a claim for restitution, and the court leaves the parties as it finds them—even though that may result in one party retaining a benefit it received under the contract.  Restatement (Second) of Contracts §§ 197, 198(b); *Seck I*, 284 A.3d at 70.  But a party less "in the wrong" has a claim for restitution under § 198(b).

The Delaware Supreme Court instructs courts assessing comparative fault under § 198 to consider the following questions:

> whether the party knew the policy was void at purchase or later learned the policy was void; whether the party had knowledge of facts tending to suggest that the policy is void; whether the party procured the illegal policy; whether the party failed to notice red flags; and whether the investor's expertise in the industry should have caused him to know or suspect that there was a substantial risk that the policy it purchased was void.

*Seck I*, 284 A.3d at 72–73.

In this case, the undisputed facts show that neither Ameritas (or its predecessor) nor FCI procured the Policy.  And neither could "know" with certainty how a court would rule at the time that FCI purchased the Policy in 2017.[18]

On the other hand, FCI undisputedly had knowledge of facts tending to suggest that the Policy may be STOLI when it bought it in 2017.  FCI has expertise in the industry, and the undisputed facts establish that it performed extensive diligence.  FCI knew of Coventry's scheme to originate needless life insurance on strangers' lives to later flip for a profit.  FCI possessed all the relevant documents showing that Sloat and her family (1) never had any responsibility for the premium payments, and (2) assigned their rights to and control over the Trust and Policy to Coventry.  FCI knew that courts had found policies void on nearly identical facts.  And FCI factored into its purchase price the risk that the Policy would be challenged and held to be unenforceable STOLI.

I'll assume, for purposes of assessing Ameritas's summary judgment motion, that it or its predecessor was or should have been aware of red flags that suggested the policy's invalidity.  And I'll assume that Ameritas was or should have been aware of those red flags before FCI's purchase in 2017.  But showing that Ameritas had some awareness—or even equal awareness—is not enough.  The ultimate question is whether a reasonable fact finder could conclude that Ameritas was more at fault than FCI.  The answer is no.  FCI knew what it was buying in 2017.  While it didn't know how everything would turn out in court, it priced in the risk it would lose when it

---

[18] U.S. Bank appears to contend that Ameritas knew or should have known that the Policy was STOLI in 2015, when Kossak pleaded guilty to loan fraud.  But U.S. Bank hasn't identified facts in connection with that prosecution relevant to whether Ameritas should have known that the Policy lacked an insurable interest.

made the gamble.   Under these circumstances, no reasonable fact finder could conclude that Ameritas was more at fault than FCI.

U.S. Bank suggests that allowing Ameritas to keep the premiums would be contrary to the Delaware Supreme Court's remark in *Seck I* that the § 198 analysis should "incentivize[] insurers to speak up when the circumstances suggest that a policy is void for lack of an insurable interest because they will not be able to retain premiums if they stay silent after being put on inquiry notice."  *Seck I,* 284 A.3d at 72.  But I do not read that passage to mean that whoever is on inquiry notice first is more "in the wrong" for purposes of § 198.  And permitting FCI to recover restitution under these circumstances would be contrary to *Seck I*'s observation that an investor should not be able to purchase a policy it suspects to be unenforceable and expect to get its premiums back.  *Id.*; *cf. Sun Life Assur. Co. of Canada v. Wells Fargo Bank, N.A.*, 44 F. 4th 1024, 1041 (7th Cir. 2022) ("*Corwell*") (denying restitution when the investor "was fully informed about Coventry's scheme and took a calculated risk to try to profit from it by purchasing [the] policy at a discount and then attempting to cash in at h[er] death").

31

Viewing the evidence of record in the light most favorable to U.S. Bank, it shows (at best) that Ameritas was equally at fault.  Under these circumstances, restitution is unavailable under § 198(b) and the Court leaves the parties to this unenforceable contract as it finds them.[19, 20]

The Court will grant summary judgment that Ameritas does not owe restitution.

### D.     U.S. Bank's Counterclaims Fail as a Matter of Law.

Ameritas is entitled to summary judgment on all of U.S. Bank's counterclaims.  U.S. Bank's "Fifth Cause of Action" asserts unjust enrichment, which the Court construes as a claim for restitution.  It fails for the reasons already stated.

U.S. Bank's "First Cause of Action" is a breach of contract claim based on Ameritas's failure to pay the death benefit.  And U.S. Bank's "Third Cause of Action" is a claim for breach of the covenant of good faith and fair dealing.  But as explained above, the Policy is void *ab initio*

---

[19] The Court separately rejects U.S. Bank's argument that it is entitled to recover premium payments made by FCI's predecessors in interest.  I am deeply skeptical that the Delaware Supreme Court would ever allow a securities intermediary to recover such payments.  *See Corwell*, 44 F.4th at 1038–39 (holding that a securities intermediary cannot recover premiums paid by prior beneficial owners of a policy); *Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, No. 20-735, 2023 WL 9227098, at *6 (D. Del. Oct. 11, 2023) ("[T]he Delaware Supreme Court has never definitively decided whether a securities intermediary can ever recover payments made by the current owner's predecessors-in-interest.  I think that the Supreme Court will conclude that it cannot."); *cf. Wilmington Tr., Nat'l Assoc. v. Sun Life Assur. Co. of Canada*, 294 A.3d 1062, 1077 (Del. 2023) ("*De Bourbon & Frankel*") (noting but declining to address request for payments made by prior owners).

Even if recovery of premiums paid by prior owners were sometimes permissible, it would not be appropriate here.  To establish entitlement to premiums paid by prior owners, U.S. Bank would have to "prove that all or some of the former owners were less at fault" than Ameritas.  *De Bourbon & Frankel*, 294 A.3d at 1077.  Here, the prior owner of the Policy was AIG.  And the undisputed facts show that AIG played an instrumental role in the STOLI scheme.  The only actor that could be more at fault than AIG is the Policy's other prior owner, Coventry.  Coventry engineered and directed every aspect of the STOLI scheme that led to the origination and sale of the Policy.

[20] In response to Ameritas's request for summary judgment that it does not have to pay restitution, U.S. Bank only invoked the exceptions set forth in Restatement §§ 197 and 198(b). Accordingly, the Court does not assess §§ 198(a) or 199.

and never came into existence.  *Berland II*, 2022 WL 15023450, at *6; *see also Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 136 (3d Cir. 2005) ("It is axiomatic that a breach of contract claim may not be maintained in the absence of a valid contract.").  Summary judgment will be granted in favor of Ameritas on these claims.

U.S. Bank's "Second Cause of Action" is a fraud claim.  U.S. Bank articulates its theory of fraud as follows: "(1) the Policy specifically contained a promise to return the premiums to the Policy's owner, (2) Ameritas repeatedly reassured the Policy's owner that it was a Florida policy, and (3) Ameritas continued to bill, collect, and retain premium payments on the Policy in the total amount of $11,035,273.86 over the course of almost seventeen years."  (D.I. 177 at 30–31.)  There are numerous problems with U.S. Bank's fraud claim.  The biggest problem is that U.S. Bank's brief opposing summary judgment does not support its argument with any citations to the factual record or the parties' statements of fact.  Moreover, the Court has independently reviewed the record and cannot locate any facts that could support a finding of fraud.  For example, there is no evidence that Ameritas collected premiums after it had already made a decision to challenge the Sloat Policy.  Nor could a reasonable fact finder construe Ameritas's policy-verification communications as a representation that the Policy had an insurable interest or that Ameritas had conducted an insurable interest assessment.  Indeed, FCI never asked Ameritas or AIG whether the Policy was supported by an insurable interest at inception.  And U.S. Bank hasn't pointed to any evidence suggesting that Ameritas expressly told FCI or anyone else that the interpretation of the Policy would be governed by Florida law.  Summary judgment will be granted in favor of Ameritas on this claim.

U.S. Bank's "Fourth Cause of Action" is a promissory estoppel claim.  This claim fails because Delaware law is clear that the doctrine of promissory estoppel cannot be used to enforce

33

a STOLI policy. *De Bourbon & Frankel*, 294 A.3d at 1072–74; *Berland II*, 2022 WL 15023450, at *6. Summary judgment will be granted in favor of Ameritas on this claim.

## IV.   CONCLUSION

For the reasons above, Ameritas's motion for summary judgment (D.I. 160) will be GRANTED, and U.S. Bank's partial motion for summary judgment (D.I. 161) will be DENIED. An Order and Judgment will be entered.